# ELK GROVE UNIFIED SCHOOL DISTRICT ET AL. *v.* NEWDOW ET AL.

No. 02–1624.   Argued March 24, 2004—Decided June 14, 2004

2

*Terence J. Cassidy* argued the cause for petitioners. With him on the briefs was *Michael W. Pott.*

*Solicitor General Olson* argued the cause for the United States as respondent under this Court's Rule 12.6 in support of petitioners. With him on the briefs were *Assistant Attorney General Keisler, Deputy Solicitor General Clement, Deputy Assistant Attorney General Katsas, Patricia A. Millett, Robert M. Loeb, Lowell V. Sturgill,* and *Sushma Soni.*

*Michael A. Newdow, pro se,* argued the cause and filed a brief as respondent.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Texas et al. by *Greg Abbott,* Attorney General of Texas, *R. Ted Cruz,* Solicitor General, *Barry R. McBee,* First Assistant Attorney General, *Edward D. Burbach* and *Don R. Willett,* Deputy Attorneys General, *Peter C. Harvey,* Acting Attorney General of New Jersey, and *Gerald J. Pappert,* Acting Attorney General of Pennsylvania, and by the Attorneys General for their respective States as follows: *William H. Pryor, Jr.,* of Alabama, *Gregg D. Renkes* of Alaska, *Terry Goddard* of Arizona, *Mike Beebe* of Arkansas, *Bill Lockyer* of California, *Ken Salazar* of Colorado, *Richard Blumenthal* of Connecticut, *M. Jane Brady* of Delaware, *Charles J. Crist, Jr.,* of Florida, *Thurbert E. Baker* of Georgia, *Mark J. Bennett* of Hawaii, *Lawrence G. Wasden* of Idaho, *Lisa Madigan* of Illinois, *Steve Carter* of Indiana, *Thomas J. Miller* of Iowa, *Phill Kline* of Kansas, *A. B. "Ben" Chandler* of Kentucky, *Richard P. Ieyoub* of Louisiana, *G. Steven Rowe* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Thomas F. Reilly* of Massachusetts, *Michael A. Cox* of Michigan, *Mike Hatch* of Minnesota, *Mike Moore* of Mississippi, *Jeremiah W. "Jay" Nixon* of Missouri, *Mike McGrath* of Montana, *Jon Bruning* of Nebraska, *Brian Sandoval* of Nevada, *Peter W. Heed* of New Hampshire, *Patricia A. Madrid* of New Mexico, *Eliot Spitzer* of New York, *Roy Cooper* of North Carolina, *Wayne Stenehjem* of North Dakota, *Jim Petro* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Patrick C. Lynch* of Rhode Island, *Henry McMaster* of South

4

JUSTICE STEVENS delivered the opinion of the Court.

Each day elementary school teachers in the Elk Grove Unified School District (School District) lead their classes in

Carolina, *Lawrence E. Long* of South Dakota, *Paul G. Summers* of Tennessee, *Mark L. Shurtleff* of Utah, *William H. Sorrell* of Vermont, *Jerry W. Kilgore* of Virginia, *Christine O. Gregoire* of Washington, *Darrell V. McGraw, Jr.,* of West Virginia, *Peg Lautenschlager* of Wisconsin, and *Patrick J. Crank* of Wyoming; for the American Civil Rights Union by *John C. Armor* and *Peter Ferrara;* for the American Jewish Congress by *Marc D. Stern* and *Norman Redlich;* for the American Legion by *Eric L. Hirschhorn* and *Philip B. Onderdonk, Jr.;* for the Bipartisan Legal Advisory Group of the United States House of Representatives by *Geraldine R. Gennet, Kerry W. Kircher,* and *Michael L. Stern;* for the Catholic League for Religious and Civil Rights et al. by *Edward L. White III* and *Charles S. LiMandri;* for the Center for Individual Freedom by *Renee L. Giachino;* for the Christian Legal Society et al. by *Gregory S. Baylor, Kimberlee Wood Colby,* and *Stuart J. Lark;* for Citizens United Foundation by *William J. Olson* and *John S. Miles;* for the Claremont Institute Center for Constitutional Jurisprudence by *John C. Eastman, Edwin Meese III,* and *Phillip J. Griego;* for Focus on the Family et al. by *Benjamin W. Bull, Jordan W. Lorence, Kevin H. Theriot, Robert H. Tyler,* and *Patrick A. Trueman;* for Grassfire.net by *John G. Stepanovich;* for the Institute in Basic Life Principles et al. by *Bernard P. Reese, Jr.;* for the Knights of Columbus by *Kevin J. Hasson, Anthony R. Picarello, Jr., Roman P. Storzer, Carl A. Anderson, Paul R. Devin,* and *Robert A. Destro;* for Liberty Counsel et al. by *Mathew D. Staver* and *Rena M. Lindevaldsen;* for the National Education Association by *Robert H. Chanin* and *Jeremiah A. Collins;* for the National Jewish Commission on Law and Public Affairs by *Nathan Lewin, Alyza D. Lewin, Dennis Rapps, David Zwiebel,* and *Richard B. Stone;* for the National Lawyers Association Foundation by *Dennis Owens* and *Robert C. Cannada;* for the National School Boards Association by *Lisa A. Brown, Erin Glenn Busby, Julie Underwood,* and *Naomi Gittins;* for the Pacific Justice Institute by *Peter D. Lepiscopo;* for the Pacific Research Institute et al. by *Sharon L. Browne* and *Russell C. Brooks;* for the Rutherford Institute by *John W. Whitehead* and *Steven H. Aden;* for the United States Senate by *Patricia Mack Bryan, Morgan J. Frankel, Grant R. Vinik,* and *Thomas E. Caballero;* for Wallbuilders, Inc., by *Barry C. Hodge;* for Senator George Allen et al. by *Jay Alan Sekulow, Stuart J. Roth, Colby M. May, James M. Henderson, Walter M. Weber, Joel H. Thornton, John P. Tuskey,* and *Laura B. Hernandez;* for Sandra L. Banning by *Kenneth W. Starr, Robert R. Gasaway, Ashley C. Parrish, Stephen W. Parrish,* and *Paul E. Sullivan;* for Senator John Cornyn et al.

a group recitation of the Pledge of Allegiance. Respondent, Michael A. Newdow, is an atheist whose daughter partici- pates in that daily exercise. Because the Pledge contains the words "under God," he views the School District's policy as a religious indoctrination of his child that violates the First Amendment. A divided panel of the Court of Appeals for the Ninth Circuit agreed with Newdow. In light of the obvious importance of that decision, we granted certiorari to review the First Amendment issue and, preliminarily, the question whether Newdow has standing to invoke the juris- diction of the federal courts. We conclude that Newdow lacks standing and therefore reverse the Court of Appeals' decision.

---

by *Mr. Cornyn, pro se;* for Idaho Governor Dirk Kempthorne et al. by *L. Michael Bogert* and *David F. Hensley;* and for Congressman Ron Paul et al. by *Richard D. Ackerman* and *Gary G. Kreep.*

Briefs of *amici curiae* urging affirmance were filed for American Athe- ists by *Paul Sanford;* for the American Humanist Association et al. by *Elizabeth L. Hileman;* for Americans United for Separation of Church and State et al. by *David H. Remes, Ayesha Khan,* and *Steven R. Shapiro;* for the Anti-Defamation League by *Martin E. Karlinsky, Martin S. Led- erman, Steven M. Freeman, Michael Lieberman, Frederick M. Lawrence, Howard W. Goldstein,* and *Erwin Chemerinsky;* for Associated Pantheist Groups by *Michael C. Worsham* and *Dov M. Szego;* for Atheists for Human Rights by *Jerold M. Gorski;* for Buddhist Temples et al. by *Kenneth R. Pierce;* for the Church of Freethought by *Keith Alan;* for the Council for Secular Humanism by *Edward Tabash;* for the Freedom From Religion Foundation, Inc., by *Robert Reitano Tiernan;* for Historians and Law Scholars by *Steven K. Green* and *Steven G. Gey;* for Religious Scholars and Theologians by *Peter Irons;* for Rob Sherman Advocacy by *Richard D. Grossman;* for Seattle Atheists et al. by *Gary D. Borek;* for United Fathers of America et al. by *Mr. Gorski;* for Rev. Dr. Betty Jane Bailey et al. by *Douglas Laycock;* for Christopher L. Eisgruber et al. by *Lawrence G. Sager;* and for Barbara A. McGraw by *Ms. McGraw, pro se.*

Briefs of *amici curiae* were filed for Atheists and other Freethinkers by *Dean Robert Johansson;* for the Atheist Law Center by *Pamela L. Sumners* and *Larry Darby;* for the Common Good Foundation et al. by *Keith A. Fournier* and *John G. Stepanovich;* for Thurston Greene by *Mr. Greene, pro se;* for Joseph R. Grodin by *Neal Katyal* and *Richard A. Epstein;* and for Mister Thorne by *Ronald K. Losch.*

I

"The very purpose of a national flag is to serve as a symbol of our country," *Texas* v. *Johnson*, 491 U. S. 397, 405 (1989), and of its proud traditions "of freedom, of equal opportunity, of religious tolerance, and of good will for other peoples who share our aspirations," *id.*, at 437 (STEVENS, J., dissenting). As its history illustrates, the Pledge of Allegiance evolved as a common public acknowledgment of the ideals that our flag symbolizes. Its recitation is a patriotic exercise designed to foster national unity and pride in those principles.

The Pledge of Allegiance was initially conceived more than a century ago. As part of the nationwide interest in commemorating the 400th anniversary of Christopher Columbus' discovery of America, a widely circulated national magazine for youth proposed in 1892 that pupils recite the following affirmation: "I pledge allegiance to my Flag and the Republic for which it stands: one Nation indivisible, with Liberty and Justice for all."[1] In the 1920's, the National Flag Conferences replaced the phrase "my Flag" with "the flag of the United States of America."

In 1942, in the midst of World War II, Congress adopted, and the President signed, a Joint Resolution codifying a detailed set of "rules and customs pertaining to the display and use of the flag of the United States of America." Ch. 435, 56 Stat. 377. Section 7 of this codification provided in full:

> "That the pledge of allegiance to the flag, 'I pledge allegiance to the flag of the United States of America and to the Republic for which it stands, one Nation indivisible, with liberty and justice for all', be rendered by

---

[1] J. Baer, The Pledge of Allegiance: A Centennial History, 1892–1992, p. 3 (1992) (internal quotation marks omitted). At the time, the phrase "one Nation indivisible" had special meaning because the question whether a State could secede from the Union had been intensely debated and was unresolved prior to the Civil War. See J. Randall, Constitutional Problems Under Lincoln 12–24 (rev. ed. 1964). See also W. Rehnquist, Centennial Crisis: The Disputed Election of 1876, p. 182 (2004).

standing with the right hand over the heart; extending the right hand, palm upward, toward the flag at the words 'to the flag' and holding this position until the end, when the hand drops to the side. However, civilians will always show full respect to the flag when the pledge is given by merely standing at attention, men removing the headdress. Persons in uniform shall render the military salute." *Id.*, at 380.

This resolution, which marked the first appearance of the Pledge of Allegiance in positive law, confirmed the importance of the flag as a symbol of our Nation's indivisibility and commitment to the concept of liberty.

Congress revisited the Pledge of Allegiance 12 years later when it amended the text to add the words "under God." Act of June 14, 1954, ch. 297, 68 Stat. 249. The House Report that accompanied the legislation observed that, "[f]rom the time of our earliest history our peoples and our institutions have reflected the traditional concept that our Nation was founded on a fundamental belief in God." H. R. Rep. No. 1693, 83d Cong., 2d Sess., 2 (1954). The resulting text is the Pledge as we know it today: "I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all." 4 U. S. C. §4.

## II

Under California law, "every public elementary school" must begin each day with "appropriate patriotic exercises." Cal. Educ. Code Ann. §52720 (West 1989). The statute provides that "[t]he giving of the Pledge of Allegiance to the Flag of the United States of America shall satisfy" this requirement. *Ibid.* The Elk Grove Unified School District has implemented the state law by requiring that "[e]ach elementary school class recite the pledge of allegiance to the

flag once each day."[2] Consistent with our case law, the School District permits students who object on religious grounds to abstain from the recitation. See *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943).

ᛁ In March 2000, Newdow filed suit in the United States District Court for the Eastern District of California against the United States Congress, the President of the United States, the State of California, and the School District and its superintendent.[3] App. 24. At the time of filing, Newdow's daughter was enrolled in kindergarten in the School District and participated in the daily recitation of the Pledge. Styled as a mandamus action, the complaint explains that Newdow is an atheist who was ordained more than 20 years ago in a ministry that "espouses the religious philosophy that the true and eternal bonds of righteousness and virtue stem from reason rather than mythology." *Id.*, at 42, ¶ 53. The complaint seeks a declaration that the 1954 Act's addition of the words "under God" violated the Establishment and Free Exercise Clauses of the United States Constitution,[4] as well as an injunction against the School District's policy requiring daily recitation of the Pledge. *Id.*, at 42. It alleges that Newdow has standing to sue on his own behalf and on behalf of his daughter as "next friend." *Id.*, at 26, 56.

---

[2] Elk Grove Unified School District's Policy AR 6115, App. to Brief for United States as Respondent Supporting Petitioners 2a.

[3] Newdow also named as defendants the Sacramento City Unified School District and its superintendent on the chance that his daughter might one day attend school in that district. App. 48. The Court of Appeals held that Newdow lacks standing to challenge that district's policy because his daughter is not currently a student there. *Newdow* v. *U. S. Congress*, 328 F. 3d 466, 485 (CA9 2003) *(Newdow III)*. Newdow has not challenged that ruling.

[4] The First Amendment provides in relevant part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U. S. Const., Amdt. 1. The Religion Clauses apply to the States by incorporation into the Fourteenth Amendment. See *Cantwell* v. *Connecticut*, 310 U. S. 296, 303 (1940).

The case was referred to a Magistrate Judge, whose brief findings and recommendation concluded, "the Pledge does not violate the Establishment Clause." *Id.*, at 79. The District Court adopted that recommendation and dismissed the complaint on July 21, 2000. App. to Pet. for Cert. 97. The Court of Appeals reversed and issued three separate decisions discussing the merits and Newdow's standing.

In its first opinion the appeals court unanimously held that Newdow has standing "as a parent to challenge a practice that interferes with his right to direct the religious education of his daughter." *Newdow* v. *U. S. Congress*, 292 F. 3d 597, 602 (CA9 2002) *(Newdow I)*. That holding sustained Newdow's standing to challenge not only the policy of the School District, where his daughter still is enrolled, but also the 1954 Act of Congress that had amended the Pledge, because his " 'injury in fact' " was " 'fairly traceable' " to its enactment. *Id.*, at 603–605. On the merits, over the dissent of one judge, the court held that both the 1954 Act and the School District's policy violate the Establishment Clause of the First Amendment. *Id.*, at 612.

After the Court of Appeals' initial opinion was announced, Sandra Banning, the mother of Newdow's daughter, filed a motion for leave to intervene, or alternatively to dismiss the complaint. App. 82. She declared that although she and Newdow shared "physical custody" of their daughter, a state-court order granted her "exclusive legal custody" of the child, "including the sole right to represent [the daughter's] legal interests and make all decision[s] about her education" and welfare. *Id.*, at 82, ¶¶ 2–3. Banning further stated that her daughter is a Christian who believes in God and has no objection either to reciting or hearing others recite the Pledge of Allegiance, or to its reference to God. *Id.*, at 83, ¶ 4. Banning expressed the belief that her daughter would be harmed if the litigation were permitted to proceed, because others might incorrectly perceive the child as sharing her father's atheist views. *Id.*, at 85, ¶ 10. Ban-

ning accordingly concluded, as her daughter's sole legal custodian, that it was not in the child's interest to be a party to Newdow's lawsuit. *Id.*, at 85. On September 25, 2002, the California Superior Court entered an order enjoining Newdow from including his daughter as an unnamed party or suing as her "next friend." That order did not purport to answer the question of Newdow's Article III standing. See *Newdow* v. *U. S. Congress*, 313 F. 3d 500, 502 (CA9 2002) *(Newdow II)*.

In a second published opinion, the Court of Appeals reconsidered Newdow's standing in light of Banning's motion. The court noted that Newdow no longer claimed to represent his daughter, but unanimously concluded that "the grant of sole legal custody to Banning" did not deprive Newdow, "as a noncustodial parent, of Article III standing to object to unconstitutional government action affecting his child." *Id.*, at 502–503. The court held that under California law Newdow retains the right to expose his child to his particular religious views even if those views contradict the mother's, and that Banning's objections as sole legal custodian do not defeat Newdow's right to seek redress for an alleged injury to his own parental interests. *Id.*, at 504–505.

On February 28, 2003, the Court of Appeals issued an order amending its first opinion and denying rehearing en banc. *Newdow* v. *U. S. Congress*, 328 F. 3d 466, 468 (CA9 2003) *(Newdow III)*. The amended opinion omitted the initial opinion's discussion of Newdow's standing to challenge the 1954 Act and declined to determine whether Newdow was entitled to declaratory relief regarding the constitutionality of that Act. *Id.*, at 490. Nine judges dissented from the denial of en banc review. *Id.*, at 471, 482. We granted the School District's petition for a writ of certiorari to consider two questions: (1) whether Newdow has standing as a noncustodial parent to challenge the School District's policy, and (2) if so, whether the policy offends the First Amendment. 540 U. S. 945 (2003).

## III

In every federal case, the party bringing the suit must establish standing to prosecute the action. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth* v. *Seldin,* 422 U. S. 490, 498 (1975). The standing requirement is born partly of " 'an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.'" *Allen* v. *Wright,* 468 U. S. 737, 750 (1984) (quoting *Vander Jagt* v. *O'Neill,* 699 F. 2d 1166, 1178–1179 (CADC 1983) (Bork, J., concurring)).

The command to guard jealously and exercise rarely our power to make constitutional pronouncements requires strictest adherence when matters of great national significance are at stake. Even in cases concededly within our jurisdiction under Article III, we abide by "a series of rules under which [we have] avoided passing upon a large part of all the constitutional questions pressed upon [us] for decision." *Ashwander* v. *TVA,* 297 U. S. 288, 346 (1936) (Brandeis, J., concurring). Always we must balance "the heavy obligation to exercise jurisdiction," *Colorado River Water Conservation Dist.* v. *United States,* 424 U. S. 800, 820 (1976), against the "deeply rooted" commitment "not to pass on questions of constitutionality" unless adjudication of the constitutional issue is necessary, *Spector Motor Service, Inc.* v. *McLaughlin,* 323 U. S. 101, 105 (1944). See also *Rescue Army* v. *Municipal Court of Los Angeles,* 331 U. S. 549, 568–575 (1947).

Consistent with these principles, our standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, see *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 559–562 (1992); and prudential standing, which embodies "judicially self-imposed limits on the exercise of federal jurisdiction,"

*Allen,* 468 U. S., at 751. The Article III limitations are familiar: The plaintiff must show that the conduct of which he complains has caused him to suffer an "injury in fact" that a favorable judgment will redress. See *Lujan,* 504 U. S., at 560–561. Although we have not exhaustively defined the prudential dimensions of the standing doctrine, we have explained that prudential standing encompasses "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen,* 468 U. S., at 751. See also *Secretary of State of Md.* v. *Joseph H. Munson Co.,* 467 U. S. 947, 955–956 (1984). "Without such limitations—closely related to Art. III concerns but essentially matters of judicial self-governance—the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Warth,* 422 U. S., at 500.

One of the principal areas in which this Court has customarily declined to intervene is the realm of domestic relations. Long ago we observed that "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States." *In re Burrus,* 136 U. S. 586, 593–594 (1890). See also *Mansell* v. *Mansell,* 490 U. S. 581, 587 (1989) ("[D]omestic relations are preeminently matters of state law"); *Moore* v. *Sims,* 442 U. S. 415, 435 (1979) ("Family relations are a traditional area of state concern"). So strong is our deference to state law in this area that we have recognized a "domestic relations exception" that "divests the federal courts of power to issue divorce, alimony, and child custody decrees." *Ankenbrandt* v. *Richards,* 504 U. S. 689, 703

(1992). We have also acknowledged that it might be appropriate for the federal courts to decline to hear a case involving "elements of the domestic relationship," *id.*, at 705, even when divorce, alimony, or child custody is not strictly at issue:

> "This would be so when a case presents 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar.' Such might well be the case if a federal suit were filed prior to effectuation of a divorce, alimony, or child custody decree, and the suit depended on a determination of the status of the parties." *Id.*, at 705–706 (quoting *Colorado River*, 424 U. S., at 814).

Thus, while rare instances arise in which it is necessary to answer a substantial federal question that transcends or exists apart from the family law issue, see, *e. g.*, *Palmore* v. *Sidoti*, 466 U. S. 429, 432–434 (1984), in general it is appropriate for the federal courts to leave delicate issues of domestic relations to the state courts.[5]

As explained briefly above, the extent of the standing problem raised by the domestic relations issues in this case was not apparent until August 5, 2002, when Banning filed

---

[5] Our holding does not rest, as THE CHIEF JUSTICE suggests, see *post*, at 19–22 (opinion concurring in judgment), on either the domestic relations exception or the abstention doctrine. Rather, our prudential standing analysis is informed by the variety of contexts in which federal courts decline to intervene because, as *Ankenbrandt* v. *Richards*, 504 U. S. 689 (1992), contemplated, the suit "depend[s] on a determination of the status of the parties," *id.*, at 706. We deemed it appropriate to review the dispute in *Palmore* because it "raise[d] important federal concerns arising from the Constitution's commitment to eradicating discrimination based on race." 466 U. S., at 432. In this case, by contrast, the disputed family law rights are entwined inextricably with the threshold standing inquiry. THE CHIEF JUSTICE in this respect, see *post*, at 21–22, misses our point: The *merits* question undoubtedly transcends the domestic relations issue, but the *standing* question surely does not.

her motion for leave to intervene or dismiss the complaint following the Court of Appeals' initial decision. At that time, the child's custody was governed by a February 6, 2002, order of the California Superior Court. That order provided that Banning had "*'sole* legal custody as to the rights and responsibilities to make decisions relating to the health, education and welfare of'" her daughter. *Newdow II*, 313 F. 3d, at 502. The order stated that the two parents should "'consult with one another on substantial decisions relating to'" the child's "'psychological and educational needs,'" but it authorized Banning to "'exercise legal control'" if the parents could not reach "'mutual agreement.'" *Ibid.*

That family court order was the controlling document at the time of the Court of Appeals' standing decision. After the Court of Appeals ruled, however, the Superior Court held another conference regarding the child's custody. At a hearing on September 11, 2003, the Superior Court announced that the parents have "joint legal custody," but that Banning "makes the final decisions if the two . . . disagree." App. 127–128.[6]

---

[6] The court confirmed that position in a written order issued January 9, 2004:

"The parties will have joint legal custody defined as follows: Ms. Banning will continue to make the final decisions as to the minor's health, education, and welfare if the two parties cannot mutually agree. The parties are required to consult with each other on substantial decisions relating to the health, education and welfare of the minor child, including . . . psychological and educational needs of the minor. If mutual agreement is not reached in these areas, then Ms. Banning may exercise legal control of the minor that is not specifically prohibited or is inconsistent with the physical custody." App. to Reply Brief for United States as Respondent Supporting Petitioners 12a.

Despite the use of the term "joint legal custody"—which is defined by California statute, see Cal. Fam. Code Ann. § 3003 (West 1994)—we see no meaningful distinction for present purposes between the custody order issued February 6, 2002, and the one issued January 9, 2004. Under either order, Newdow has the right to consult on issues relating to the

Newdow contends that despite Banning's final authority, he retains "an unrestricted right to inculcate in his daughter—free from governmental interference—the atheistic beliefs he finds persuasive." *Id.*, at 48, ¶ 78. The difficulty with that argument is that Newdow's rights, as in many cases touching upon family relations, cannot be viewed in isolation. This case concerns not merely Newdow's interest in inculcating his child with his views on religion, but also the rights of the child's mother as a parent generally and under the Superior Court orders specifically. And most important, it implicates the interests of a young child who finds herself at the center of a highly public debate over her custody, the propriety of a widespread national ritual, and the meaning of our Constitution.

The interests of the affected persons in this case are in many respects antagonistic. Of course, legal disharmony in family relations is not uncommon, and in many instances that disharmony poses no bar to federal-court adjudication of proper federal questions. What makes this case different is that Newdow's standing derives entirely from his relationship with his daughter, but he lacks the right to litigate as her next friend. In marked contrast to our case law on *jus tertii*, see, *e. g.*, *Singleton* v. *Wulff*, 428 U. S. 106, 113–118 (1976) (plurality opinion), the interests of this parent and this child are not parallel and, indeed, are potentially in conflict.[7]

---

child's education, but Banning possesses what we understand amounts to a tie-breaking vote.

[7] "There are good and sufficient reasons for th[e] prudential limitation on standing when rights of third parties are implicated—the avoidance of the adjudication of rights which those not before the Court may not wish to assert, and the assurance that the most effective advocate of the rights at issue is present to champion them." *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S. 59, 80 (1978). Banning tells us that her daughter has no objection to the Pledge, and we are mindful in cases such as this that "children themselves have constitutionally protectible interests." *Wisconsin* v. *Yoder*, 406 U. S. 205, 243

Newdow's parental status is defined by California's domestic relations law. Our custom on questions of state law ordinarily is to defer to the interpretation of the Court of Appeals for the Circuit in which the State is located. See *Bishop* v. *Wood*, 426 U. S. 341, 346–347 (1976). In this case, the Court of Appeals, which possesses greater familiarity with California law, concluded that state law vests in Newdow a cognizable right to influence his daughter's religious upbringing. *Newdow II*, 313 F. 3d, at 504–505. The court based its ruling on two intermediate state appellate cases holding that "while the custodial parent undoubtedly has the right to make ultimate decisions concerning the child's religious upbringing, a court will not enjoin the noncustodial parent from discussing religion with the child or involving the child in his or her religious activities in the absence of a showing that the child will be thereby harmed." *In re Marriage of Murga*, 103 Cal. App. 3d 498, 505, 163 Cal. Rptr. 79, 82 (1980). See also *In re Marriage of Mentry*, 142 Cal. App. 3d 260, 268–270, 190 Cal. Rptr. 843, 849–850 (1983) (relying on *Murga* to invalidate portion of restraining order barring noncustodial father from engaging children in religious activity or discussion without custodial parent's consent). Animated by a conception of "family privacy" that includes "not simply a policy of minimum state intervention but also a presumption of parental autonomy," 142 Cal. App. 3d, at 267–268, 190 Cal. Rptr., at 848, the state cases create a zone of private authority within which each parent, whether custodial or noncustodial, remains free to impart to the child his or her religious perspective.

Nothing that either Banning or the School Board has done, however, impairs Newdow's right to instruct his daughter in

(1972) (Douglas, J., dissenting). In a fundamental respect, "[i]t is the future of the student, not the future of the parents," that is at stake. *Id.*, at 245.

his religious views. Instead, Newdow requests relief that is more ambitious than that sought in *Mentry* and *Murga*. He wishes to forestall his daughter's exposure to religious ideas that her mother, who wields a form of veto power, endorses, and to use his parental status to challenge the influences to which his daughter may be exposed in school when he and Banning disagree. The California cases simply do not stand for the proposition that Newdow has a right to dictate to others what they may and may not say to his child respecting religion. *Mentry* and *Murga* are concerned with protecting "'the fragile, complex interpersonal bonds between child and parent,'" 142 Cal. App. 3d, at 267, 190 Cal. Rptr., at 848, and with permitting divorced parents to expose their children to the "'diversity of religious experiences [that] is itself a sound stimulant for a child,'" *id.*, at 265, 190 Cal. Rptr., at 847. The cases speak not at all to the problem of a parent seeking to reach outside the private parent-child sphere to restrain the acts of a third party. A next friend surely could exercise such a right, but the Superior Court's order has deprived Newdow of that status.

In our view, it is improper for the federal courts to entertain a claim by a plaintiff whose standing to sue is founded on family law rights that are in dispute when prosecution of the lawsuit may have an adverse effect on the person who is the source of the plaintiff's claimed standing. When hard questions of domestic relations are sure to affect the outcome, the prudent course is for the federal court to stay its hand rather than reach out to resolve a weighty question of federal constitutional law. There is a vast difference between Newdow's right to communicate with his child—which both California law and the First Amendment recognize— and his claimed right to shield his daughter from influences to which she is exposed in school despite the terms of the custody order. We conclude that, having been deprived under California law of the right to sue as next friend, New-

dow lacks prudential standing to bring this suit in federal court.[8]

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE SCALIA took no part in the consideration or decision of this case.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR joins, and with whom JUSTICE THOMAS joins as to Part I, concurring in the judgment.

The Court today erects a novel prudential standing principle in order to avoid reaching the merits of the constitutional claim. I dissent from that ruling. On the merits, I conclude that the Elk Grove Unified School District (School District) policy that requires teachers to lead willing students in reciting the Pledge of Allegiance, which includes the words "under God," does not violate the Establishment Clause of the First Amendment.

I

The Court correctly notes that "our standing jurisprudence contains two strands: Article III standing, which en-

---

[8] Newdow's complaint and brief cite several additional bases for standing: that Newdow "at times has himself attended—and will in the future attend—class with his daughter," App. 49, ¶ 80; that he "has considered teaching elementary school students in [the School District]," *id.*, at 65, ¶ 120; that he "has attended and will continue to attend" school board meetings at which the Pledge is "routinely recited," *id.*, at 52, ¶ 85; and that the School District uses his tax dollars to implement its Pledge policy, *id.*, at 62–65. Even if these arguments suffice to establish Article III standing, they do not respond to our prudential concerns. As for taxpayer standing, Newdow does not reside in or pay taxes to the School District; he alleges that he pays taxes to the District only "indirectly" through his child support payments to Banning. Brief for Respondent Newdow 49, n. 70. That allegation does not amount to the "direct dollars-and-cents injury" that our strict taxpayer-standing doctrine requires. *Doremus* v. *Board of Ed. of Hawthorne,* 342 U. S. 429, 434 (1952).

forces the Constitution's case-or-controversy requirement, see *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 559–562 (1992); and prudential standing, which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction,' [*Allen* v. *Wright*, 468 U. S. 737, 751 (1984)]." *Ante*, at 11–12. To be clear, the Court does not dispute that respondent Newdow (hereinafter respondent) satisfies the requisites of Article III standing. But curiously the Court incorporates criticism of the Court of Appeals' Article III standing decision into its justification for its novel prudential standing principle. The Court concludes that respondent lacks prudential standing, under its new standing principle, to bring his suit in federal court.

We have, in the past, judicially self-imposed clear limits on the exercise of federal jurisdiction. See, *e. g.*, *Warth* v. *Seldin*, 422 U. S. 490, 499 (1975); *Allen* v. *Wright*, 468 U. S. 737, 751 (1984) ("Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights . . ."). In contrast, here is the Court's new prudential standing principle: "[I]t is improper for the federal courts to entertain a claim by a plaintiff whose standing to sue is founded on family law rights that are in dispute when prosecution of the lawsuit may have an adverse effect on the person who is the source of the plaintiff's claimed standing." *Ante*, at 17. The Court loosely bases this novel prudential standing limitation on the domestic relations exception to diversity-of-citizenship jurisdiction pursuant to 28 U. S. C. § 1332, the abstention doctrine, and criticisms of the Court of Appeals' construction of California state law, coupled with the prudential standing prohibition on a litigant's raising another person's legal rights.

First, the Court relies heavily on *Ankenbrandt* v. *Richards*, 504 U. S. 689 (1992), in which we discussed both the domestic relations exception and the abstention doctrine. In *Ankenbrandt*, the mother of two children sued her former

spouse and his female companion on behalf of the children, alleging physical and sexual abuse of the children. The lower courts declined jurisdiction based on the domestic relations exception to diversity jurisdiction and abstention under *Younger* v. *Harris*, 401 U. S. 37 (1971). We reversed, concluding that the domestic relations exception only applies when a party seeks to have a district court issue "divorce, alimony, and child custody decrees," *Ankenbrandt*, 504 U. S., at 704. We further held that abstention was inappropriate because "the status of the domestic relationship ha[d] been determined as a matter of state law, and in any event ha[d] no bearing on the underlying torts alleged," *id.*, at 706.

The Court first cites the domestic relations exception to support its new principle. Then the Court relies on a quote from *Ankenbrandt*'s discussion of the abstention doctrine: "We have also acknowledged that it might be appropriate for the federal courts to decline to hear a case involving 'elements of the domestic relationship,' *id.*, at 705, even when divorce, alimony, or child custody is not strictly at issue." *Ante*, at 13. The Court perfunctorily states: "Thus, while rare instances arise in which it is necessary to answer a substantial federal question that transcends or exists apart from the family law issue, see, *e. g., Palmore* v. *Sidoti*, 466 U. S. 429, 432–434 (1984), in general it is appropriate for the federal courts to leave delicate issues of domestic relations to the state courts." *Ante*, at 13. That conclusion does not follow from *Ankenbrandt*'s discussion of the domestic relations exception and abstention; even if it did, it would not be applicable in this case because, on the merits, this case presents a substantial federal question that transcends the family law issue to a greater extent than *Palmore*.

The domestic relations exception is not a prudential limitation on our federal jurisdiction. It is a limiting construction of the statute defining federal diversity jurisdiction, 28 U. S. C. § 1332, which "divests the federal courts of power to issue divorce, alimony, and child custody decrees," *Anken-*

*brandt,* 504 U. S., at 703. This case does not involve diversity jurisdiction, and respondent does not ask this Court to issue a divorce, alimony, or child custody decree. Instead it involves a substantial federal question about the constitutionality of the School District's conducting the Pledge ceremony, which is the source of our jurisdiction. Therefore, the domestic relations exception to diversity jurisdiction forms no basis for denying standing to respondent.

When we discussed abstention in *Ankenbrandt,* we first noted that "[a]bstention rarely should be invoked, because the federal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'" *Id.,* at 705 (quoting *Colorado River Water Conservation Dist.* v. *United States,* 424 U. S. 800, 817 (1976)). *Ankenbrandt's* discussion of abstention by no means supports the proposition that only in the rare instances where "a substantial federal question . . . transcends or exists apart from the family law issue," *ante,* at 13, should federal courts decide the federal issue. As in *Ankenbrandt,* "the status of the domestic relationship has been determined as a matter of state law, and in any event has no bearing on the underlying [constitutional violation] alleged." 504 U. S., at 706. Sandra Banning and respondent now share joint custody of their daughter, respondent retains the right to expose his daughter to his religious views, and the state of their domestic affairs has nothing to do with the underlying constitutional claim. Abstention forms no basis for denying respondent standing.

The Court cites *Palmore* v. *Sidoti,* 466 U. S. 429 (1984), as an example of the exceptional case where a "substantial federal question that transcends or exists apart from the family law issue" makes the exercise of our jurisdiction appropriate. *Ante,* at 13. In *Palmore,* we granted certiorari to review a child custody decision, and reversed the state court's decision because we found that the effects of racial prejudice resulting from the mother's interracial marriage could not justify granting custody to the father. Contrary to the Court's as-

sertion, the alleged constitutional violation, while clearly involving a "substantial federal question," did not "transcen[d] or exis[t] apart from the family law issue," *ante*, at 13; it had everything to do with the domestic relationship—"[w]e granted certiorari to review a *judgment of a state court divesting a natural mother of the custody of her infant child*," 466 U. S., at 430 (emphasis added). Under the Court's discussion today, it appears that we should have stayed out of the "domestic dispute" in *Palmore* no matter how constitutionally offensive the result would have been.

Finally, it seems the Court bases its new prudential standing principle, in part, on criticisms of the Court of Appeals' construction of state law, coupled with the prudential principle prohibiting third-party standing. In the Court of Appeals' original opinion, it held unanimously that respondent satisfied the Article III standing requirements, stating respondent "has standing as a parent to challenge a practice that interferes with his right to direct the religious education of his daughter." *Newdow* v. *U. S. Congress*, 292 F. 3d 597, 602 (CA9 2002). After Banning moved for leave to intervene, the Court of Appeals reexamined respondent's standing to determine whether the parents' court-ordered custodial arrangement altered respondent's standing. *Newdow* v. *U. S. Congress*, 313 F. 3d 500 (CA9 2002). The court examined whether respondent could assert an injury in fact by asking whether, under California law, "noncustodial parents maintain the right to expose and educate their children to their individual religious views, even if those religious views contradict those of the custodial parent."[1] *Id.*, at 504. The Court of Appeals again unanimously concluded that the respondent satisfied Article III standing, despite the custody order, because he retained sufficient parental rights under California law. *Id.*, at 504–505 (citing *In re Marriage of*

---

[1] I note that respondent contends that he has never been a "noncustodial" parent and points out that under the state court's most recent order he enjoys joint legal custody. Brief for Respondent Newdow 40.

*Murga* v. *Petersen,* 103 Cal. App. 3d 498, 163 Cal. Rptr. 79 (1980); *In re Marriage of Mentry,* 142 Cal. App. 3d 260, 190 Cal. Rptr. 843 (1983)).

The Court, contrary to the Court of Appeals' interpretation of California case law, concludes that respondent "requests relief that is more ambitious than that sought in *Mentry* and *Murga*" because he seeks to restrain the act of a third party outside the parent-child sphere. *Ante,* at 17. The Court then mischaracterizes respondent's alleged interest based on the Court's *de novo* construction of California law.

The correct characterization of respondent's interest rests on the interpretation of state law. As the Court recognizes, *ante,* at 16, we have a "settled and firm policy of deferring to regional courts of appeals in matters that involve the construction of state law." *Bowen* v. *Massachusetts,* 487 U. S. 879, 908 (1988). We do so "not only to render unnecessary review of their decisions in this respect, but also to reflect our belief that district courts and courts of appeals are better schooled in and more able to interpret the laws of their respective States." *Brockett* v. *Spokane Arcades, Inc.,* 472 U. S. 491, 500 (1985) (internal quotation marks and citation omitted). In contrast to the Court, I would defer to the Court of Appeals' interpretation of California law because it is our settled policy to do so, and because I think that the Court of Appeals has the better reading of *Murga, supra,* and *Mentry, supra.*

The Court does not take issue with the fact that, under California law, respondent retains a right to influence his daughter's religious upbringing and to expose her to his views. But it relies on Banning's view of the merits of this case to diminish respondent's interest, stating that the respondent "wishes to forestall his daughter's exposure to religious ideas that her mother, who wields a form of veto power, endorses, and to use his parental status to challenge the influences to which his daughter may be exposed in

school when he and Banning disagree." *Ante,* at 17. As alleged by respondent and as recognized by the Court of Appeals, respondent wishes to enjoin the School District from endorsing a form of religion inconsistent with his own views because he has a right to expose his daughter to those views without the State's placing its *imprimatur* on a particular religion. Under the Court of Appeals' construction of California law, Banning's "veto power" does not override respondent's right to challenge the Pledge ceremony.

The Court concludes that the California cases "do not stand for the proposition that [respondent] has a right to dictate to others what they may or may not say to his child respecting religion." *Ibid.* Surely, under California case law and the current custody order, respondent may not tell Banning what she may say to their child respecting religion, and respondent does not seek to. Just as surely, respondent cannot name his daughter as a party to a lawsuit against Banning's wishes. But his claim is different: Respondent does not seek to tell just anyone what he or she may say to his daughter, and he does not seek to vindicate solely her rights.

Respondent asserts that the School District's Pledge ceremony infringes his right under California law to expose his daughter to his religious views. While she is intimately associated with the source of respondent's standing (the father-daughter relationship and respondent's rights thereunder), the daughter *is not the source* of respondent's standing; instead it is their relationship that provides respondent his standing, which is clear once respondent's interest is properly described.[2] The Court's criticisms of the Court of

---

[2] Also as properly described, it is clear that this is not the same as a next-friend suit. The Court relies on the fact that respondent "[was] deprived under California law of the right to sue as next friend." *Ante,* at 17. The same Superior Court that determined that respondent could not sue as next friend stated:

Appeals' Article III standing decision and the prudential prohibition on third-party standing provide no basis for denying respondent standing.

Although the Court may have succeeded in confining this novel principle almost narrowly enough to be, like the proverbial excursion ticket—good for this day only—our doctrine of prudential standing should be governed by general principles, rather than ad hoc improvisations.

## II

The Pledge of Allegiance reads:

> "I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all."   4 U. S. C. § 4.

As part of an overall effort to "codify and emphasize existing rules and customs pertaining to the display and use of the flag of the United States of America," see H. R. Rep. No. 2047, 77th Cong., 2d Sess., 1 (1942); S. Rep. No. 1477, 77th Cong., 2d Sess., 1 (1942), Congress enacted the Pledge on June 22, 1942.   Pub. L. 623, ch. 435, § 7, 56 Stat. 380, former 36 U. S. C. § 1972.   Congress amended the Pledge to include the phrase "under God" in 1954.   Act of June 14, 1954, ch. 297, § 7, 68 Stat. 249.   The amendment's sponsor, Representative Rabaut, said its purpose was to contrast this country's belief in God with the Soviet Union's embrace of atheism.   100 Cong. Rec. 1700 (1954).   We do not know what

---

"'To the extent that by not naming her you have ... an individual right as a parent to say that, "not only for all the children of the world but in—mine in particular, I believe that this child—my child is being harmed," but the child is ... not actually part of the suit, I don't know that there's any way that this court could preclude that.'"   App. to Brief for Respondent Newdow B4.

The California court did not reject Newdow's right as distinct from his daughter's, and we should not either.

other Members of Congress thought about the purpose of the amendment. Following the decision of the Court of Appeals in this case, Congress passed legislation that made extensive findings about the historic role of religion in the political development of the Nation and reaffirmed the text of the Pledge. Act of Nov. 13, 2002, Pub. L. 107–293, §§ 1–2, 116 Stat. 2057–2060. To the millions of people who regularly recite the Pledge, and who have no access to, or concern with, such legislation or legislative history, "under God" might mean several different things: that God has guided the destiny of the United States, for example, or that the United States exists under God's authority. How much consideration anyone gives to the phrase probably varies, since the Pledge itself is a patriotic observance focused primarily on the flag and the Nation, and only secondarily on the description of the Nation.

The phrase "under God" in the Pledge seems, as a historical matter, to sum up the attitude of the Nation's leaders, and to manifest itself in many of our public observances. Examples of patriotic invocations of God and official acknowledgments of religion's role in our Nation's history abound.

At George Washington's first inauguration on April 30, 1789, he

> "stepped toward the iron rail, where he was to receive the oath of office. The diminutive secretary of the Senate, Samuel Otis, squeezed between the President and Chancellor Livingston and raised up the crimson cushion with a Bible on it. Washington put his right hand on the Bible, opened to Psalm 121:1: 'I raise my eyes toward the hills. Whence shall my help come.' The Chancellor proceeded with the oath: 'Do you solemnly swear that you will faithfully execute the office of President of the United States and will to the best of your ability preserve, protect and defend the Constitution of the United States?' The President responded, 'I solemnly swear,' and repeated the oath, adding, 'So help me God.'

He then bent forward and kissed the Bible before him."
M. Riccards, A Republic, If You Can Keep It: The
Foundation of the American Presidency, 1700–1800,
pp. 73–74 (1987).

Later the same year, after encouragement from Congress,[3]
Washington issued his first Thanksgiving proclamation,
which began:

> "Whereas it is the duty of all Nations to acknowledge
> the providence of Almighty God, to obey his will, to be
> grateful for his benefits, and humbly to implore his pro-
> tection and favor—and whereas both Houses of Con-
> gress have by their joint Committee requested me 'to
> recommend to the People of the United States a day of
> public thanksgiving and prayer to be observed by ac-
> knowledging with grateful hearts the many signal fa-
> vors of Almighty God especially by affording them an
> opportunity peaceably to establish a form of government
> for their safety and happiness.'" 4 Papers of George
> Washington 131: Presidential Series (W. Abbot &
> D. Twohig eds. 1993).

Almost all succeeding Presidents have issued similar
Thanksgiving proclamations.

Later Presidents, at critical times in the Nation's history,
have likewise invoked the name of God. Abraham Lincoln,
concluding his masterful Gettysburg Address in 1863, used
the very phrase "under God":

> "It is rather for us to be here dedicated to the great task
> remaining before us—that from these honored dead we
> take increased devotion to that cause for which they

---

[3] "The day after the First Amendment was proposed, Congress urged President Washington to proclaim 'a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts the many and signal favours of Almighty God.'" *Lynch v. Donnelly*, 465 U. S. 668, 675, n. 2 (1984).

gave the last full measure of devotion—that we here highly resolve that these dead shall not have died in vain—that this nation, under God, shall have a new birth of freedom—and that government of the people, by the people, for the people, shall not perish from the earth." 1 Documents of American History 429 (H. Commager ed. 8th ed. 1968).

Lincoln's equally well-known second inaugural address, delivered on March 4, 1865, makes repeated references to God, concluding with these famous words:

"With malice toward none, with charity for all, with firmness in the right as God gives us to see the right, let us strive on to finish the work we are in, to bind up the nation's wounds, to care for him who shall have borne the battle and for his widow and his orphan, to do all which may achieve and cherish a just and lasting peace among ourselves and with all nations." *Id.*, at 443.

Woodrow Wilson appeared before Congress in April 1917, to request a declaration of war against Germany. He finished with these words:

"But the right is more precious than peace, and we shall fight for the things which we have always carried nearest our hearts,—for democracy, for the right of those who submit to authority to have a voice in their own Governments, for the rights and liberties of small nations, for a universal dominion of right for such a concert of free peoples as shall bring peace and safety to all nations and make the world itself at last free. To such a task we can dedicate our lives and our fortunes, everything that we are and everything that we have, with the pride of those who know that the day has come when America is privileged to spend her blood and her might for the principles that gave her birth and happiness and

the peace which she has treasured.  God helping her, she can do no other."  2 *id.*, at 132.

President Franklin Delano Roosevelt, taking the office of the Presidency in the depths of the Great Depression, concluded his first inaugural address with these words: "In this dedication of a nation we humbly ask the blessing of God. May He protect each and every one of us!  May He guide me in the days to come!"  2 *id.*, at 242.

General Dwight D. Eisenhower, who would himself serve two terms as President, concluded his "Order of the Day" to the soldiers, sailors, and airmen of the Allied Expeditionary Force on D-Day—the day on which the Allied Forces successfully landed on the Normandy beaches in France— with these words: "Good Luck!  And let us all beseech the blessing of Almighty God upon this great and noble undertaking," http://www.eisenhower.archives.gov/dl/DDay/ SoldiersSailorsAirmen.pdf (all Internet materials as visited June 9, 2004, and available in Clerk of Court's case file).

The motto "In God We Trust" first appeared on the country's coins during the Civil War.  Secretary of the Treasury Salmon P. Chase, acting under the authority of an Act of Congress passed in 1864, prescribed that the motto should appear on the two cent coin.  The motto was placed on more and more denominations, and since 1938 all United States coins bear the motto.  Paper currency followed suit at a slower pace; Federal Reserve notes were so inscribed during the decade of the 1960's.  Meanwhile, in 1956, Congress declared that the motto of the United States would be "In God we Trust."  Act of July 30, 1956, ch. 795, 70 Stat. 732.

Our Court Marshal's opening proclamation concludes with the words " 'God save the United States and this honorable Court.' "  The language goes back at least as far as 1827. O. Smith, Early Indiana Trials and Sketches: Reminiscences (1858) (quoted in 1 C. Warren, The Supreme Court in United States History 469 (rev. ed. 1926)).

All of these events strongly suggest that our national culture allows public recognition of our Nation's religious history and character. In the words of the House Report that accompanied the insertion of the phrase "under God" in the Pledge: "From the time of our earliest history our peoples and our institutions have reflected the traditional concept that our Nation was founded on a fundamental belief in God." H. R. Rep. No. 1693, 83d Cong., 2d Sess., 2 (1954). Giving additional support to this idea is our national anthem The Star-Spangled Banner, adopted as such by Congress in 1931. 36 U. S. C. § 301 and Historical and Revision Notes. The last verse ends with these words:

> "Then conquer we must, when our cause it is just,
> "And this be our motto: 'In God is our trust.'
> "And the star-spangled banner in triumph shall wave
> "O'er the land of the free and the home of the brave!"
> http://www.bcpl.net/~etowner/anthem.html.

As pointed out by the Court, California law requires public elementary schools to "conduc[t] . . . appropriate patriotic exercises" at the beginning of the schoolday, and notes that the "giving of the Pledge of Allegiance to the Flag of the United States of America shall satisfy the requirements of this section." Cal. Educ. Code Ann. § 52720 (West 1989). The School District complies with this requirement by instructing that "[e]ach elementary school class recite the [P]ledge of [A]llegiance to the [F]lag once each day." App. 149–150. Students who object on religious (or other) grounds may abstain from the recitation. *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642 (1943) (holding that the government may not compel school students to recite the Pledge).

Notwithstanding the voluntary nature of the School District policy, the Court of Appeals, by a divided vote, held that the policy violates the Establishment Clause of the First Amendment because it "impermissibly coerces a religious

act." *Newdow* v. *U. S. Congress*, 328 F. 3d 466, 487 (CA9 2003). To reach this result, the court relied primarily on our decision in *Lee* v. *Weisman*, 505 U. S. 577 (1992). That case arose out of a graduation ceremony for a public high school in Providence, Rhode Island. The ceremony began with an invocation and ended with a benediction, both given by a local rabbi. The Court held that even though attendance at the ceremony was voluntary, students who objected to the prayers would nonetheless feel coerced to attend and to stand during each prayer. But the Court throughout its opinion referred to the prayer as "an explicit religious exercise," *id.*, at 598, and "a formal religious exercise," *id.*, at 589.

As the Court notes in its opinion, "the Pledge of Allegiance evolved as a common public acknowledgment of the ideals that our flag symbolizes. Its recitation is a patriotic exercise designed to foster national unity and pride in those principles." *Ante*, at 6.

I do not believe that the phrase "under God" in the Pledge converts its recital into a "religious exercise" of the sort described in *Lee*. Instead, it is a declaration of belief in allegiance and loyalty to the United States flag and the Republic that it represents. The phrase "under God" is in no sense a prayer, nor an endorsement of any religion, but a simple recognition of the fact noted in H. R. Rep. No. 1693, at 2: "From the time of our earliest history our peoples and our institutions have reflected the traditional concept that our Nation was founded on a fundamental belief in God." Reciting the Pledge, or listening to others recite it, is a patriotic exercise, not a religious one; participants promise fidelity to our flag and our Nation, not to any particular God, faith, or church.[4]

---

[4] JUSTICE THOMAS concludes, based partly on *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943), that *Lee* v. *Weisman*, 505 U. S. 577 (1992), coercion is present in the School District policy. *Post*, at 46–47 (opinion concurring in judgment). I cannot agree. *Barnette* involved a board of education policy that compelled students to recite the Pledge.

There is no doubt that respondent is sincere in his atheism and rejection of a belief in God. But the mere fact that he disagrees with this part of the Pledge does not give him a veto power over the decision of the public schools that willing participants should pledge allegiance to the flag in the manner prescribed by Congress. There may be others who disagree, not with the phrase "under God," but with the phrase "with liberty and justice for all." But surely that would not give such objectors the right to veto the holding of such a ceremony by those willing to participate. Only if it can be said that the phrase "under God" somehow tends to the establishment of a religion in violation of the First Amendment can respondent's claim succeed, where one based on objections to "with liberty and justice for all" fails. Our cases have broadly interpreted this phrase, but none have gone anywhere near as far as the decision of the Court of Appeals in this case. The recital, in a patriotic ceremony pledging allegiance to the flag and to the Nation, of the descriptive phrase "under God" cannot possibly lead to the establishment of a religion, or anything like it.

When courts extend constitutional prohibitions beyond their previously recognized limit, they may restrict democratic choices made by public bodies. Here, Congress prescribed a Pledge of Allegiance, the State of California required patriotic observances in its schools, and the School

---

319 U. S., at 629. There was no opportunity to opt out, as there is in the present case. "Failure to conform [was] 'insubordination' dealt with by expulsion. Readmission [was] denied by statute until compliance. Meanwhile the expelled child [was] 'unlawfully absent' and [could] be proceeded against as a delinquent. His parents or guardians [were] liable to prosecution, and if convicted [were] subject to a fine not exceeding $50 and jail term not exceeding thirty days." *Ibid.* (footnotes omitted). I think there is a clear difference between compulsion *(Barnette)* and coercion *(Lee)*. Compulsion, after *Barnette,* is not permissible, and it is not an issue in this case. And whatever the virtues and vices of *Lee,* the Court was concerned only with "formal religious exercise[s]," 505 U. S., at 589, which the Pledge is not.

District chose to comply by requiring teacher-led recital of the Pledge of Allegiance by willing students. Thus, we have three levels of popular government—the national, the state, and the local—collaborating to produce the Elk Grove ceremony. The Constitution only requires that schoolchildren be entitled to abstain from the ceremony if they chose to do so. To give the parent of such a child a sort of "heckler's veto" over a patriotic ceremony willingly participated in by other students, simply because the Pledge of Allegiance contains the descriptive phrase "under God," is an unwarranted extension of the Establishment Clause, an extension which would have the unfortunate effect of prohibiting a commendable patriotic observance.

JUSTICE O'CONNOR, concurring in the judgment.

I join the concurrence of THE CHIEF JUSTICE in full. Like him, I would follow our policy of deferring to the Federal Courts of Appeals in matters that involve the interpretation of state law, see *Bowen* v. *Massachusetts*, 487 U. S. 879 (1988), and thereby conclude that respondent Newdow does have standing to bring his constitutional claim before a federal court. Like THE CHIEF JUSTICE, I believe that we must examine those questions, and, like him, I believe that petitioner school district's policy of having its teachers lead students in voluntary recitations of the Pledge of Allegiance does not offend the Establishment Clause. But while the history presented by THE CHIEF JUSTICE illuminates the constitutional problems this case presents, I write separately to explain the principles that guide my own analysis of the constitutionality of that policy.

As I have said before, the Establishment Clause "cannot easily be reduced to a single test. There are different categories of Establishment Clause cases, which may call for different approaches." *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet*, 512 U. S. 687, 720 (1994) (concurring opinion). When a court confronts a challenge to

government-sponsored speech or displays, I continue to believe that the endorsement test "captures the essential command of the Establishment Clause, namely, that government must not make a person's religious beliefs relevant to his or her standing in the political community by conveying a message 'that religion or a particular religious belief is favored or preferred.'" *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 627 (1989) (opinion concurring in part and concurring in judgment) (quoting *Wallace* v. *Jaffree,* 472 U. S. 38, 70 (1985) (O'CONNOR, J., concurring in judgment)). In that context, I repeatedly have applied the endorsement test, *Capitol Square Review and Advisory Bd.* v. *Pinette,* 515 U. S. 753, 772–773 (1995) (opinion concurring in part and concurring in judgment) (display of a cross in a plaza next to state capitol); *Allegheny, supra,* at 625 (display of creche in county courthouse and menorah outside city and county buildings); *Wallace, supra,* at 69 (statute authorizing a meditative moment of silence in classrooms); *Lynch* v. *Donnelly,* 465 U. S. 668, 688 (1984) (O'CONNOR, J., concurring) (inclusion of Nativity scene in city government's Christmas display), and I would do so again here.

Endorsement, I have explained, "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Ibid.* In order to decide whether endorsement has occurred, a reviewing court must keep in mind two crucial and related principles.

First, because the endorsement test seeks "to identify those situations in which government makes adherence to a religion relevant . . . to a person's standing in the political community," it assumes the viewpoint of a reasonable observer. *Pinette,* 515 U. S., at 772 (internal quotation marks omitted). Given the dizzying religious heterogeneity of our

Nation, adopting a subjective approach would reduce the test to an absurdity. Nearly any government action could be overturned as a violation of the Establishment Clause if a "heckler's veto" sufficed to show that its message was one of endorsement. See *id.*, at 780 ("There is always *someone* who, with a particular quantum of knowledge, reasonably might perceive a particular action as an endorsement of religion"). Second, because the "reasonable observer" must embody a community ideal of social judgment, as well as rational judgment, the test does not evaluate a practice in isolation from its origins and context. Instead, the reasonable observer must be deemed aware of the history of the conduct in question, and must understand its place in our Nation's cultural landscape. See *id.*, at 781.

The Court has permitted government, in some instances, to refer to or commemorate religion in public life. See, *e. g.*, *Pinette, supra; Allegheny, supra; Lynch, supra; Marsh* v. *Chambers,* 463 U. S. 783 (1983). While the Court's explicit rationales have varied, my own has been consistent; I believe that although these references speak in the language of religious belief, they are more properly understood as employing the idiom for essentially secular purposes. One such purpose is to commemorate the role of religion in our history. In my view, some references to religion in public life and government are the inevitable consequence of our Nation's origins. Just as the Court has refused to ignore changes in the religious composition of our Nation in explaining the modern scope of the Religion Clauses, see, *e. g.*, *Wallace, supra,* at 52–54 (even if the Religion Clauses were originally meant only to forestall intolerance between Christian sects, they now encompass all forms of religious conscience), it should not deny that our history has left its mark on our national traditions. It is unsurprising that a Nation founded by religious refugees and dedicated to religious freedom should find references to divinity in its symbols, songs, mot-

toes, and oaths.* Eradicating such references would sever ties to a history that sustains this Nation even today. See *Allegheny, supra,* at 623 (declining to draw lines that would "sweep away all government recognition and acknowledgment of the role of religion in the lives of our citizens").

Facially religious references can serve other valuable purposes in public life as well. Twenty years ago, I wrote that such references "serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." *Lynch, supra,* at 692–693 (concurring opinion). For centuries, we have marked important occasions or pronouncements with references to God and invocations of divine assistance. Such references can serve to solemnize an occasion instead of to invoke divine provenance. The reasonable observer discussed above, fully aware of our national history and the origins of such practices, would not perceive these acknowledgments as signifying a government endorsement of any specific religion, or even of religion over nonreligion.

There are no *de minimis* violations of the Constitution— no constitutional harms so slight that the courts are obliged

---

*Note, for example, the following state mottoes: Arizona ("God Enriches"); Colorado ("Nothing without Providence"); Connecticut ("He Who Transplanted Still Sustains"); Florida ("In God We Trust"); Ohio ("With God All Things Are Possible"); and South Dakota ("Under God the People Rule"). Arizona, Colorado, and Florida have placed their mottoes on their state seals, and the mottoes of Connecticut and South Dakota appear on the flags of those States as well. Georgia's newly redesigned flag includes the motto "In God We Trust." The oaths of judicial office, citizenship, and military and civil service all end with the (optional) phrase "[S]o help me God." See 28 U. S. C. § 453; 5 U. S. C. § 3331; 10 U. S. C. § 502; 8 CFR § 337.1 (2004). Many of our patriotic songs contain overt or implicit references to the divine, among them: America ("Protect us by thy might, great God our King"); America the Beautiful ("God shed his grace on thee"); and God bless America.

to ignore them. Given the values that the Establishment Clause was meant to serve, however, I believe that government can, in a discrete category of cases, acknowledge or refer to the divine without offending the Constitution. This category of "ceremonial deism" most clearly encompasses such things as the national motto ("In God We Trust"), religious references in traditional patriotic songs such as The Star-Spangled Banner, and the words with which the Marshal of this Court opens each of its sessions ("God save the United States and this honorable Court"). See *Allegheny*, 492 U. S., at 630 (O'CONNOR, J., concurring in part and concurring in judgment). These references are not minor trespasses upon the Establishment Clause to which I turn a blind eye. Instead, their history, character, and context prevent them from being constitutional violations at all.

This case requires us to determine whether the appearance of the phrase "under God" in the Pledge of Allegiance constitutes an instance of such ceremonial deism. Although it is a close question, I conclude that it does, based on my evaluation of the following four factors.

*History and Ubiquity*

The constitutional value of ceremonial deism turns on a shared understanding of its legitimate nonreligious purposes. That sort of understanding can exist only when a given practice has been in place for a significant portion of the Nation's history, and when it is observed by enough persons that it can fairly be called ubiquitous. See *Lynch*, 465 U. S., at 693. By contrast, novel or uncommon references to religion can more easily be perceived as government endorsements because the reasonable observer cannot be presumed to be fully familiar with their origins. As a result, in examining whether a given practice constitutes an instance of ceremonial deism, its "history and ubiquity" will be of great importance. As I explained in *Allegheny, supra*, at 630–631:

38

> "Under the endorsement test, the 'history and ubiquity' of a practice is relevant not because it creates an 'artificial exception' from that test. On the contrary, the 'history and ubiquity' of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion."

Fifty years have passed since the words "under God" were added, a span of time that is not inconsiderable given the relative youth of our Nation. In that time, the Pledge has become, alongside the singing of The Star-Spangled Banner, our most routine ceremonial act of patriotism; countless schoolchildren recite it daily, and their religious heterogeneity reflects that of the Nation as a whole. As a result, the Pledge and the context in which it is employed are familiar and nearly inseparable in the public mind. No reasonable observer could have been surprised to learn the words of the Pledge, or that petitioner school district has a policy of leading its students in daily recitation of the Pledge.

It cannot be doubted that "no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it. Yet an unbroken practice . . . is not something to be lightly cast aside." *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 678 (1970). And the history of a given practice is all the more relevant when the practice has been employed pervasively without engendering significant controversy. In *Lynch*, where we evaluated the constitutionality of a town Christmas display that included a creche, we found relevant to the endorsement question the fact that the display had "apparently caused no political divisiveness prior to the filing of this lawsuit" despite its use for over 40 years. See 465 U. S., at 692–693. Similarly, in the 50 years that the Pledge has been recited as it is now, by millions of children, this was, at the time of its filing, only the third reported case of which I am aware to

challenge it as an impermissible establishment of religion. See *Sherman* v. *Community Consol. School Dist. 21*, 980 F. 2d 437 (CA7 1992); *Smith* v. *Denny*, 280 F. Supp. 651 (ED Cal. 1968). The citizens of this Nation have been neither timid nor unimaginative in challenging government practices as forbidden "establishments" of religion. See, *e. g.*, *Altman* v. *Bedford Central School Dist.*, 245 F. 3d 49 (CA2 2001) (challenging, among other things, reading of a story of the Hindu deity Ganesha in a fourth-grade classroom); *Alvarado* v. *San Jose*, 94 F. 3d 1223 (CA9 1996) (challenge to use of a sculpture of the Aztec deity Quetzalcoatl to commemorate Mexican contributions to city culture); *Peloza* v. *Capistrano Unified School Dist.*, 37 F. 3d 517 (CA9 1994) (high school biology teacher's challenge to requirement that he teach the concept of evolution); *Fleischfresser* v. *Directors of School Dist. 200*, 15 F. 3d 680 (CA7 1994) (challenge to school supplemental reading program that included works of fantasy involving witches, goblins, and Halloween); *United States* v. *Allen*, 760 F. 2d 447, 449 (CA2 1985) (challenge to conviction for vandalism of B–52 bomber, based on theory that property-protection statute established a " 'national religion of nuclearism . . . in which the bomb is the new source of salvation' "); *Grove* v. *Mead School Dist. No. 354*, 753 F. 2d 1528 (CA9 1985) (challenge to use of The Learning Tree, by Gordon Parks, in high school English literature class); *Crowley* v. *Smithsonian Inst.*, 636 F. 2d 738 (CADC 1980) (challenge to museum display that explained the concept of evolution). Given the vigor and creativity of such challenges, I find it telling that so little ire has been directed at the Pledge.

*Absence of worship or prayer*

"[O]ne of the greatest dangers to the freedom of the individual to worship in his own way [lies] in the Government's placing its official stamp of approval upon one particular kind of prayer or one particular form of religious services."

*Engel* v. *Vitale*, 370 U. S. 421, 429 (1962). Because of this principle, only in the most extraordinary circumstances could actual worship or prayer be defended as ceremonial deism. We have upheld only one such prayer against Establishment Clause challenge, and it was supported by an extremely long and unambiguous history. See *Marsh* v. *Chambers*, 463 U. S. 783 (1983) (upholding Nebraska Legislature's 128-year-old practice of opening its sessions with a prayer offered by a chaplain). Any statement that has as its purpose placing the speaker or listener in a penitent state of mind, or that is intended to create a spiritual communion or invoke divine aid, strays from the legitimate secular purposes of solemnizing an event and recognizing a shared religious history. *Santa Fe Independent School Dist.* v. *Doe*, 530 U. S. 290, 309 (2000) ("[T]he use of an invocation to foster . . . solemnity is impermissible when, in actuality, it constitutes [state-sponsored] prayer").

Of course, any statement *can* be imbued by a speaker or listener with the qualities of prayer. But, as I have explained, the relevant viewpoint is that of a reasonable observer, fully cognizant of the history, ubiquity, and context of the practice in question. Such an observer could not conclude that reciting the Pledge, including the phrase "under God," constitutes an instance of worship. I know of no religion that incorporates the Pledge into its canon, nor one that would count the Pledge as a meaningful expression of religious faith. Even if taken literally, the phrase is merely descriptive; it purports only to identify the United States as a Nation subject to divine authority. That cannot be seen as a serious invocation of God or as an expression of individual submission to divine authority. Cf. *Engel, supra,* at 424 (describing prayer as "a solemn avowal of divine faith and supplication for the blessings of the Almighty"). A reasonable observer would note that petitioner school district's policy of Pledge recitation appears under the heading of "Patriotic Exercises," and the California law which it implements re-

fers to "appropriate patriotic exercises." Cal. Educ. Code Ann. § 52720 (West 1989). Petitioner school district also employs teachers, not chaplains or religious instructors, to lead its students' exercise; this serves as a further indication that it does not treat the Pledge as a prayer. Cf. *Lee* v. *Weisman*, 505 U. S. 577, 594 (1992) (reasoning that a graduation benediction could not be construed as a *de minimis* religious exercise without offending the rabbi who offered it).

It is true that some of the legislators who voted to add the phrase "under God" to the Pledge may have done so in an attempt to attach to it an overtly religious message. See H. R. Rep. No. 1693, 83d Cong., 2d Sess., 2–3 (1954). But their intentions cannot, on their own, decide our inquiry. First of all, those legislators also had permissible secular objectives in mind—they meant, for example, to acknowledge the religious origins of our Nation's belief in the "individuality and the dignity of the human being." *Id.*, at 1. Second—and more critically—the *subsequent* social and cultural history of the Pledge shows that its original secular character was not transformed by its amendment. In *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203 (1963), we explained that a government may initiate a practice "for the impermissible purpose of supporting religion" but nevertheless "retai[n] the la[w] for the permissible purpose of furthering overwhelmingly secular ends." *Id.*, at 263–264 (citing *McGowan* v. *Maryland*, 366 U. S. 420 (1961)). Whatever the sectarian ends its authors may have had in mind, our continued repetition of the reference to "one Nation under God" in an exclusively patriotic context has shaped the cultural significance of that phrase to conform to that context. Any religious freight the words may have been meant to carry originally has long since been lost. See *Lynch*, 465 U. S., at 716 (Brennan, J., dissenting) (suggesting that the reference to God in the Pledge might be permissible because it has "lost through rote repetition any significant religious content").

*Absence of reference to particular religion*

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson* v. *Valente,* 456 U. S. 228, 244 (1982). While general acknowledgments of religion need not be viewed by reasonable observers as denigrating the nonreligious, the same cannot be said of instances "where the endorsement is sectarian, in the sense of specifying details upon which men and women who believe in a benevolent, omnipotent Creator and Ruler of the world are known to differ." *Weisman, supra,* at 641 (SCALIA, J., dissenting). As a result, no religious acknowledgment could claim to be an instance of ceremonial deism if it explicitly favored one particular religious belief system over another.

The Pledge complies with this requirement. It does not refer to a nation "under Jesus" or "under Vishnu," but instead acknowledges religion in a general way: a simple reference to a generic "God." Of course, some religions—Buddhism, for instance—are not based upon a belief in a separate Supreme Being. See Brief for Buddhist Temples et al. as *Amici Curiae* 15–16. But one would be hard pressed to imagine a brief solemnizing reference to religion that would adequately encompass every religious belief expressed by any citizen of this Nation. The phrase "under God," conceived and added at a time when our national religious diversity was neither as robust nor as well recognized as it is now, represents a tolerable attempt to acknowledge religion and to invoke its solemnizing power without favoring any individual religious sect or belief system.

*Minimal religious content*

A final factor that makes the Pledge an instance of ceremonial deism, in my view, is its highly circumscribed reference to God. In most of the cases in which we have struck down government speech or displays under the Establishment Clause, the offending religious content has been much more

pervasive.  See, *e. g., Weisman, supra,* at 581–582 (prayers involving repeated thanks to God and requests for blessings). Of course, a ceremony cannot avoid Establishment Clause scrutiny simply by avoiding an explicit mention of God.  See *Wallace* v. *Jaffree,* 472 U. S. 38 (1985) (invalidating Alabama statute providing moment of silence for meditation or voluntary prayer).  But the brevity of a reference to religion or to God in a ceremonial exercise can be important for several reasons.  First, it tends to confirm that the reference is being used to acknowledge religion or to solemnize an event rather than to endorse religion in any way.  Second, it makes it easier for those participants who wish to "opt out" of language they find offensive to do so without having to reject the ceremony entirely.  And third, it tends to limit the ability of government to express a preference for one religious sect over another.

The reference to "God" in the Pledge of Allegiance qualifies as a minimal reference to religion; Newdow's challenge focuses on only two of the Pledge's 31 words.  Moreover, the presence of those words is not absolutely essential to the Pledge, as demonstrated by the fact that it existed without them for over 50 years.  As a result, students who wish to avoid saying the words "under God" still can consider themselves meaningful participants in the exercise if they join in reciting the remainder of the Pledge.

I have framed my inquiry as a specific application of the endorsement test by examining whether the ceremony or representation would convey a message to a reasonable observer, familiar with its history, origins, and context, that those who do not adhere to its literal message are political outsiders.  But consideration of these factors would lead me to the same result even if I were to apply the "coercion" test that has featured in several opinions of this Court. *Santa Fe Independent School Dist.* v. *Doe,* 530 U. S. 290 (2000); *Lee* v. *Weisman,* 505 U. S. 577 (1992).

The coercion test provides that, "at a minimum, . . . government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" *Id.*, at 587 (quoting *Lynch*, 465 U. S., at 678). Any coercion that persuades an onlooker to participate in an act of ceremonial deism is inconsequential, as an Establishment Clause matter, because such acts are simply not religious in character. As a result, symbolic references to religion that qualify as instances of ceremonial deism will pass the coercion test as well as the endorsement test. This is not to say, however, that government could *overtly* coerce a person to participate in an act of ceremonial deism. Our cardinal freedom is one of belief; leaders in this Nation cannot force us to proclaim our allegiance to *any* creed, whether it be religious, philosophic, or political. That principle found eloquent expression in a case involving the Pledge itself, even before it contained the words to which Newdow now objects. See *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642 (1943) (Jackson, J.). The compulsion of which Justice Jackson was concerned, however, was of the direct sort—the Constitution does not guarantee citizens a right entirely to avoid ideas with which they disagree. It would betray its own principles if it did; no robust democracy insulates its citizens from views that they might find novel or even inflammatory.

\*   \*   \*

Michael Newdow's challenge to petitioner school district's policy is a well-intentioned one, but his distaste for the reference to "one Nation under God," however sincere, cannot be the yardstick of our Establishment Clause inquiry. Certain ceremonial references to God and religion in our Nation are the inevitable consequence of the religious history that gave birth to our founding principles of liberty. It would be ironic indeed if this Court were to wield our constitutional

commitment to religious freedom so as to sever our ties to the traditions developed to honor it.

JUSTICE THOMAS, concurring in the judgment.

We granted certiorari in this case to decide whether the Elk Grove Unified School District's Pledge policy violates the Constitution. The answer to that question is: "no." But in a testament to the condition of our Establishment Clause jurisprudence, the Court of Appeals reached the opposite conclusion based on a persuasive reading of our precedent, especially *Lee* v. *Weisman,* 505 U. S. 577 (1992). In my view, *Lee* adopted an expansive definition of "coercion" that cannot be defended however one decides the "difficult question" of "[w]hether and how th[e Establishment] Clause should constrain state action under the Fourteenth Amendment." *Zelman* v. *Simmons-Harris,* 536 U. S. 639, 678 (2002) (THOMAS, J., concurring). The difficulties with our Establishment Clause cases, however, run far deeper than *Lee.*[1]

Because I agree with THE CHIEF JUSTICE that respondent Newdow has standing, I would take this opportunity to begin the process of rethinking the Establishment Clause. I would acknowledge that the Establishment Clause is a federalism provision, which, for this reason, resists incorpora-

---

[1] This is by no means a novel observation. See, *e. g., Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819, 861 (1995) (THOMAS, J., concurring) (noting that "our Establishment Clause jurisprudence is in hopeless disarray"); *Lamb's Chapel* v. *Center Moriches Union Free School Dist.,* 508 U. S. 384, 398–401 (1993) (SCALIA, J., concurring in judgment). We have selectively invoked particular tests, such as the *"Lemon* test," *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971), with predictable outcomes. See, *e. g., Lamb's Chapel, supra,* at 398–401 (SCALIA, J., concurring in judgment). Our jurisprudential confusion has led to results that can only be described as silly. In *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573 (1989), for example, the Court distinguished between a creche on the one hand and an 18-foot Chanukah menorah placed near a 45-foot Christmas tree on the other. The Court held that the first display violated the Establishment Clause but that the second did not.

tion. Moreover, as I will explain, the Pledge policy is not implicated by any sensible incorporation of the Establishment Clause, which would probably cover little more than the Free Exercise Clause.

I

In *Lee*, the Court held that invocations and benedictions could not, consistent with the Establishment Clause, be given at public secondary school graduations. The Court emphasized "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." 505 U. S., at 592. It brushed aside both the fact that the students were not required to attend the graduation, see *id.*, at 586 (asserting that student "attendance and participation in" the graduation ceremony "are in a fair and real sense obligatory"), and the fact that they were not compelled, in any meaningful sense, to participate in the religious component of the graduation ceremony, see *id.*, at 593 ("What matters is that, given our social conventions, a reasonable dissenter in this milieu could believe that the group exercise signified her own participation or approval of it"). The Court surmised that the prayer violated the Establishment Clause because a high school student could—in light of the "peer pressure" to attend graduation and "to stand as a group or, at least, maintain respectful silence during the invocation and benediction," *ibid.*—have "a reasonable perception that she is being forced by the State to pray in a manner her conscience will not allow," *ibid.*

Adherence to *Lee* would require us to strike down the Pledge policy, which, in most respects, poses more serious difficulties than the prayer at issue in *Lee*. A prayer at graduation is a one-time event, the graduating students are almost (if not already) adults, and their parents are usually present. By contrast, very young students, removed from the protection of their parents, are exposed to the Pledge each and every day.

Moreover, this case is more troubling than *Lee* with respect to both kinds of "coercion." First, although students may feel "peer pressure" to attend their graduations, the pressure here is far less subtle: Students are actually compelled (that is, by law, and not merely "in a fair and real sense," *id.*, at 586) to attend school. See also *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 223 (1963).

Analysis of the second form of "coercion" identified in *Lee* is somewhat more complicated. It is true that since this Court decided *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943), States cannot compel (in the traditional sense) students to pledge their allegiance. Formally, then, dissenters can refuse to pledge, and this refusal would be clear to onlookers.[2] That is, students have a theoretical means of opting out of the exercise. But as *Lee* indicated: "Research in psychology supports the common assumption that adolescents are often susceptible to pressure from their peers towards conformity . . . ." 505 U. S., at 593–594. On *Lee*'s reasoning, *Barnette*'s protection is illusory, for government officials can allow children to recite the Pledge and let peer pressure take its natural and predictable course. Further, even if we assume that sitting in respectful silence could be *mistaken* for assent to or participation in a graduation prayer, dissenting students graduating from high school are not "coerced" to pray. At most, they are "coerced" into possibly appearing to assent to the prayer. The "coercion" here, however, results in unwilling children actually pledging their allegiance.[3]

---

[2] Of course, as *Lee* and subsequent cases make clear, "'[l]aw reaches past formalism.'" *Santa Fe Independent School Dist.* v. *Doe*, 530 U. S. 290, 311 (2000) (quoting *Lee* v. *Weisman*, 505 U. S. 577, 595 (1992)).

[3] Surely the "coercion" to pledge (where failure to do so is immediately obvious to one's peers) is far greater than the "coercion" resulting from a student-initiated and student-led prayer at a high school football game. See *Santa Fe Independent School Dist., supra.*

THE CHIEF JUSTICE would distinguish *Lee* by asserting "that the phrase 'under God' in the Pledge [does not] conver[t] its recital into a 'religious exercise' of the sort described in *Lee*." *Ante*, at 31 (opinion concurring in judgment). In *Barnette*, the Court addressed a state law that compelled students to salute and pledge allegiance to the flag. The Court described this as "compulsion of students to declare a belief." 319 U. S., at 631. The Pledge "require[d] affirmation of a belief and an attitude of mind." *Id.*, at 633. In its current form, reciting the Pledge entails pledging allegiance to "the Flag of the United States of America, and to the Republic for which it stands, one Nation under God." 4 U. S. C. §4. Under *Barnette*, pledging allegiance is "to declare a belief" that now includes that this is "one Nation under God." It is difficult to see how this does not entail an affirmation that God exists. Whether or not we classify affirming the existence of God as a "formal religious exercise" akin to prayer, it must present the same or similar constitutional problems.

To be sure, such an affirmation is not a prayer, and I admit that this might be a significant distinction. But the Court has squarely held that the government cannot require a person to "declare his belief in God." *Torcaso* v. *Watkins*, 367 U. S. 488, 489 (1961); *id.*, at 495 ("We repeat and again reaffirm that neither a State nor the Federal Government can constitutionally force a person 'to profess a belief or disbelief in any religion'"); see also *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 877 (1990) ("The government may not compel affirmation of religious belief"); *Widmar* v. *Vincent*, 454 U. S. 263, 269–270, n. 6 (1981) (rejecting attempt to distinguish worship from other forms of religious speech). And the Court has said, in my view questionably, that the Establishment Clause "prohibits government from appearing to take a position on questions of religious belief." *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573,

594 (1989). See also *Good News Club* v. *Milford Central School,* 533 U. S. 98, 126–127 (2001) (SCALIA, J., concurring).

I conclude that, as a matter of our precedent, the Pledge policy is unconstitutional. I believe, however, that *Lee* was wrongly decided. *Lee* depended on a notion of "coercion" that, as I discuss below, has no basis in law or reason. The kind of coercion implicated by the Religion Clauses is that accomplished *"by force of law and threat of penalty."* 505 U. S., at 640 (SCALIA, J., dissenting); see *id.,* at 640–645. Peer pressure, unpleasant as it may be, is not coercion. But rejection of *Lee*-style "coercion" does not suffice to settle this case. Although children are not coerced to pledge their allegiance, they are legally coerced to attend school. Cf., *e. g., Schempp, supra; Engel* v. *Vitale,* 370 U. S. 421 (1962). Because what is at issue is a state action, the question becomes whether the Pledge policy implicates a religious liberty right protected by the Fourteenth Amendment.

## II

I accept that the Free Exercise Clause, which clearly protects an individual right, applies against the States through the Fourteenth Amendment. See *Zelman,* 536 U. S., at 679, and n. 4 (THOMAS, J., concurring). But the Establishment Clause is another matter. The text and history of the Establishment Clause strongly suggest that it is a federalism provision intended to prevent Congress from interfering with state establishments. Thus, unlike the Free Exercise Clause, which does protect an individual right, it makes little sense to incorporate the Establishment Clause. In any case, I do not believe that the Pledge policy infringes any religious liberty right that would arise from incorporation of the Clause. Because the Pledge policy also does not infringe any free-exercise rights, I conclude that it is constitutional.

## A

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion."

Amdt. 1. As a textual matter, this Clause probably prohibits Congress from establishing a national religion. But see P. Hamburger, Separation of Church and State 106, n. 40 (2002) (citing sources). Perhaps more importantly, the Clause made clear that Congress could not interfere with state establishments, notwithstanding any argument that could be made based on Congress' power under the Necessary and Proper Clause. See A. Amar, The Bill of Rights 36–39 (1998).

Nothing in the text of the Clause suggests that it reaches any further. The Establishment Clause does not purport to protect individual rights. By contrast, the Free Exercise Clause plainly protects individuals against congressional interference with the right to exercise their religion, and the remaining Clauses within the First Amendment expressly disable Congress from "abridging [particular] *freedom[s]*." (Emphasis added.) This textual analysis is consistent with the prevailing view that the Constitution left religion to the States. See, *e. g.*, 2 J. Story, Commentaries on the Constitution of the United States § 1873 (5th ed. 1891); see also Amar, The Bill of Rights, at 32–42; *id.*, at 246–257. History also supports this understanding: At the founding, at least six States had established religions, see McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1437 (1990). Nor has this federalism point escaped the notice of Members of this Court. See, *e. g.*, *Zelman, supra*, at 677–680 (THOMAS, J., concurring); *Lee, supra*, at 641 (SCALIA, J., dissenting).

Quite simply, the Establishment Clause is best understood as a federalism provision—it protects state establishments from federal interference but does not protect any individual right. These two features independently make incorporation of the Clause difficult to understand. The best argument in favor of incorporation would be that, by disabling Congress from establishing a national religion, the Clause protected an individual right, enforceable against the Fed-

eral Government, to be free from coercive federal establishments. Incorporation of this individual right, the argument goes, makes sense. I have alluded to this possibility before. See *Zelman, supra,* at 679 (THOMAS, J., concurring) ("States may pass laws that include or touch on religious matters so long as these laws do not impede free exercise rights *or any other individual liberty interest*" (emphasis added)).

But even assuming that the Establishment Clause precludes the Federal Government from establishing a national religion, it does not follow that the Clause created or protects any individual right. For the reasons discussed above, it is more likely that States and only States were the direct beneficiaries. See also *Lee, supra,* at 641 (SCALIA, J., dissenting). Moreover, incorporation of this putative individual right leads to a peculiar outcome: It would prohibit precisely what the Establishment Clause was intended to protect—*state* establishments of religion. See *Schempp,* 374 U. S., at 310 (Stewart, J., dissenting) (noting that "the Fourteenth Amendment has somehow absorbed the Establishment Clause, although it is not without irony that a constitutional provision evidently designed to leave the States free to go their own way should now have become a restriction upon their autonomy"). Nevertheless, the potential right against federal establishments is the only candidate for incorporation.

I would welcome the opportunity to consider more fully the difficult questions whether and how the Establishment Clause applies against the States. One observation suffices for now: As strange as it sounds, an incorporated Establishment Clause prohibits exactly what the Establishment Clause protected—state practices that pertain to "an establishment of religion." At the very least, the burden of persuasion rests with anyone who claims that the term took on a different meaning upon incorporation. We must therefore determine whether the Pledge policy pertains to an "establishment of religion."

## B

The traditional "establishments of religion" to which the Establishment Clause is addressed necessarily involve actual legal coercion:

> "The coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy and of financial support *by force of law and threat of penalty.* Typically, attendance at the state church was required; only clergy of the official church could lawfully perform sacraments; and dissenters, if tolerated, faced an array of civil disabilities. L. Levy, The Establishment Clause 4 (1986). Thus, for example, in the Colony of Virginia, where the Church of England had been established, ministers were required by law to conform to the doctrine and rites of the Church of England; and all persons were required to attend church and observe the Sabbath, were tithed for the public support of Anglican ministers, and were taxed for the costs of building and repairing churches. *Id.*, at 3–4." *Lee,* 505 U. S., at 640–641 (SCALIA, J., dissenting).

Even if "establishment" had a broader definition, one that included support for religion generally through taxation, the element of legal coercion (by the State) would still be present. See *id.*, at 641.

It is also conceivable that a government could "establish" a religion by imbuing it with governmental authority, see, *e. g., Larkin* v. *Grendel's Den, Inc.,* 459 U. S. 116 (1982), or by "delegat[ing] its civic authority to a group chosen according to a religious criterion," *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet,* 512 U. S. 687, 698 (1994); *County of Allegheny,* 492 U. S., at 590–591. A religious organization that carries some measure of the authority of the State begins to look like a traditional "religious establishment," at least when that authority can be used coercively. See also *Zorach* v. *Clauson,* 343 U. S. 306, 319 (1952) (Black,

J., dissenting) (explaining that the Establishment Clause "insure[s] that no one powerful sect or combination of sects could use *political or governmental power* to punish dissenters whom they could not convert to their faith" (emphasis added)).

It is difficult to see how government practices that have nothing to do with creating or maintaining the sort of coercive state establishment described above implicate the possible liberty interest of being free from coercive state establishments. In addressing the constitutionality of voluntary school prayer, Justice Stewart made essentially this point, emphasizing that "we deal here not with the establishment of a state church, . . . but with whether school children who want to begin their day by joining in prayer must be prohibited from doing so." *Engel*, 370 U. S., at 445 (dissenting opinion).[4]

To be sure, I find much to commend the view that the Establishment Clause "bar[s] governmental preferences for *particular* religious faiths." *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 856 (1995) (THOMAS, J., concurring). But the position I suggest today is consistent with this. Legal compulsion is an inherent component of "preferences" in this context. James Madison's Memorial and Remonstrance Against Religious Assessments (re-

---

[4] It may well be the case that anything that would violate the incorporated Establishment Clause would actually violate the Free Exercise Clause, further calling into doubt the utility of incorporating the Establishment Clause. See, *e. g.*, A. Amar, The Bill of Rights 253–254 (1998). *Lee* v. *Weisman*, 505 U. S. 577 (1992), could be thought of this way to the extent that anyone might have been "coerced" into a religious exercise. Cf. *Zorach* v. *Clauson*, 343 U. S. 306, 311 (1952) (rejecting as "obtuse reasoning" a free-exercise claim where "[n]o one is forced to go to the religious classroom and no religious exercise or instruction is brought to the classrooms of the public schools"); *ibid.* (rejecting coercion-based Establishment Clause claim absent evidence that "teachers were using their office *to persuade or force* students to take the religious instruction" (emphasis added)).

printed in *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 63–72 (1947) (appendix to dissent of Rutledge, J.)), which extolled the no-preference argument, concerned coercive taxation to support an established religion, much as its title implies.[5] And, although "more extreme notions of the separation of church and state [might] be attribut[able] to Madison, many of them clearly stem from 'arguments reflecting the concepts of natural law, natural rights, and the social contract between government and a civil society,' [R. Cord, Separation of Church and State: Historical Fact and Current Fiction 22 (1982)], rather than the principle of nonestablishment in the Constitution." *Rosenberger, supra,* at 856 (THOMAS, J., concurring). See also Hamburger, Separation of Church and State, at 105 (noting that Madison's proposed language for what became the Establishment Clause did not reflect his more extreme views).

## C

Through the Pledge policy, the State has not created or maintained any religious establishment, and neither has it granted government authority to an existing religion. The Pledge policy does not expose anyone to the legal coercion associated with an established religion. Further, no other free-exercise rights are at issue. It follows that religious liberty rights are not in question and that the Pledge policy fully comports with the Constitution.

---

[5] Again, coercive government preferences might also implicate the Free Exercise Clause and are perhaps better analyzed in that framework.