Justice Scalia,
concurring.
I join the Court’s opinion. Despite my misgivings about substantive due process as an original matter, I have acquiesced in the Court’s incorporation of certain guarantees in the Bill of Rights “because it is both long established and narrowly limited.” Albright v. Oliver, 510 U. S. 266, 275 (1994) (Scalia, J., concurring). This case does not require me to reconsider that view, since straightforward application of settled doctrine suffices to decide it.
I write separately only to respond to some aspects of Justice Stevens’ dissent. Not that aspect which disagrees with the majority’s application of our precedents to this case, *792 which is fully covered by the Court’s opinion. But much of what Justice Stevens writes is a broad condemnation of the theory of interpretation which underlies the Court’s opinion, a theory that makes the traditions of our people paramount. He proposes a different theory, which he claims is more “cautiou[s]” and respectful of proper limits on the judicial role. Post, at 912. It is that claim I wish to address.
I
A
After stressing the substantive dimension of what he has renamed the “liberty clause,” post, at 861-864,[1] Justice Stevens proceeds to urge readoption of the theory of incorporation articulated in Palko v. Connecticut, 302 U. S. 319, 325 (1937), see post, at 871-877. But in fact he does not favor application of that theory at all. For whether Palko requires only that “a fair and enlightened system of justice would be impossible without” the right sought to be incorporated, 302 U. S., at 325, or requires in addition that the right be rooted in the “traditions and conscience of our people,” ibid, (internal quotation marks omitted), many of the rights Justice Stevens thinks are incorporated could not pass muster under either test: abortion, post, at 864 (citing Planned Parenthood of Southeastern Pa. v. Casey, 505 U. S. 833, 847 (1992)); homosexual sodomy, post, at 873 (citing Lawrence v. Texas, 539 U. S. 558, 572 (2003)); the right to have excluded from criminal trials evidence obtained in violation of the Fourth Amendment, post, at 875 (citing Mapp v. Ohio, 367 U. S. 643, 650, 655-657 (1961)); and the right to teach one’s *793 children foreign languages, post, at 864 (citing Meyer v. Nebraska, 262 U. S. 390, 399-403 (1923)), among others.
That Justice Stevens is not applying any version of Palko is clear from comparing, on the one hand, the rights he believes are covered, with, on the other hand, his conclusion that the right to keep and bear arms is not covered. Rights that pass his test include not just those “relating to marriage, procreation, contraception, family relationships, and child rearing and education,” but also rights against “[government action that shocks the conscience, pointlessly infringes settled expectations, trespasses into sensitive private realms or life choices without adequate justification, [or] perpetrates gross injustice. ” Post, at 879 (internal quotation marks omitted). Not all such rights are in, however, since only “some fundamental aspects of personhood, dignity, and the like” are protected, post, at 880 (emphasis added). Exactly what is covered is not clear. But whatever else is in, he knows that the right to keep and bear arms is out, despite its being as “deeply rooted in this Nation’s history and tradition,” Washington v. Glucksberg, 521 U. S. 702, 721 (1997) (internal quotation marks omitted), as a right can be, see District of Columbia v. Heller, 554 U. S. 570, 593-595, 599, 603, 614-616 (2008). I can find no other explanation for such certitude except that Justice Stevens, despite his forswearing of “personal and private notions,” post, at 878 (internal quotation marks omitted), deeply believes it should be out.
The subjective nature of Justice Stevens’ standard is also apparent from his claim that it is the courts’ prerogative — indeed their duty — to update the Due Process Clause so that it encompasses new freedoms the Framers were too narrowminded to imagine, post, at 875-877, and n. 21. Courts, he proclaims, must “do justice to [the Clause’s] urgent call and its open texture” by exercising the “interpretive discretion the latter embodies. ” Post, at 877. (Why the people are not up to the task of deciding what new rights to *794 protect, even though it is they who are authorized to. make changes, see U. S. Const., Art. V, is never explained.[2]) And it would be “judicial abdication” for a judge to “tur[n] his back” on his task of determining what the Fourteenth Amendment covers by “outsourc[ing]” the job to “historical sentiment,” post, at 876,877 — that is, by being guided by what the American people throughout our history have thought. It is only we judges, exercising our “own reasoned judgment,” post, at 872, who can be entrusted with deciding the Due Process Clause’s scope — which rights serve the Amendment’s “central values,” post, at 88(b — which basically means picking the rights we want to protect and discarding those we do not.
B
Justice Stevens resists this description, insisting that his approach provides plenty of “guideposts” and “constraints” to keep courts from “injecting excessive subjectivity” into the process.[3] Post, at 877,878. Plenty indeed — and *795 that alone is a problem. The ability of omnidirectional guideposts to constrain is inversely proportional to their number. But even individually, each lodestar or limitation he lists either is incapable of restraining judicial whimsy or cannot be squared with the precedents he seeks to preserve.
He begins with a brief nod to history, post, at 877-878, but as he has just made clear, he thinks historical inquiry unavailing, post, at 874-877. Moreover, trusting the meaning of the Due Process Clause to what has historically been protected is circular, see post, at 875-876, since that would mean no new rights could get in.
Justice Stevens moves on to the “most basic” constraint on subjectivity his theory offers: that he would “esche[w] attempts to provide any all-purpose, top-down, totalizing theory of 'liberty.’ ” Post, at 878. The notion that the absence of a coherent theory of the Due Process Clause will somehow curtail judicial caprice is at war with reason. Indeterminacy means opportunity for courts to impose whatever rule they like; it is the problem, not the solution. The idea that interpretive pluralism would reduce courts’ ability to impose their will on the ignorant masses is not merely naive, but absurd. If there are no right answers, there are no wrong answers either.
Justice Stevens also argues that requiring courts to show “respect for the democratic process” should serve as a constraint. Post, at 880. That is true, but Justice Stevens would have them show respect in an extraordinary manner. In his view, if a right “is already being given careful consideration in, and subjected to ongoing calibration by, the States, judicial enforcement may not be appropriate.” Ibid. In other words, a right, such as the right to keep and bear arms, that has long been recognized but on which the States are considering restrictions, apparently deserves less protection, while a privilege the political branches (instruments of the democratic process) have withheld entirely and continue to withhold, deserves more. That topsy-turvy ap *796 proach conveniently accomplishes the objective of ensuring that the rights this Court held protected in Casey, Lawrence, and other such cases fit the theory — but at the cost of insulting rather than respecting the democratic process.
The next constraint Justice Stevens suggests is harder to evaluate. He describes as “an important tool for guiding judicial discretion” “sensitivity to the interaction between the intrinsic aspects of liberty and the practical realities of contemporary society.” Post, at 880. I cannot say whether that sensitivity will really guide judges because I have no idea what it is. Is it some sixth sense instilled in judges when they ascend to the bench? Or does it mean judges are more constrained when they agonize about the cosmic conflict between liberty and its potentially harmful consequences? Attempting to give the concept more precision, Justice Stevens explains that “sensitivity is an aspect of a deeper principle: the need to approach our work with humility and caution.” Post, at 881. Both traits are undeniably admirable, though what relation they bear to sensitivity is a mystery. But it makes no difference, for the first case Justice Stevens cites in support, see ibid., Casey, 505 U. S., at 849, dispels any illusion that he has a meaningful form of judicial modesty in mind.
Justice Stevens offers no examples to illustrate the next constraint: stare decisis, post, at 881. But his view of it is surely not very confining, since he holds out as a “canonical” exemplar of the proper approach, see post, at 873, 909, Lawrence, which overruled a case decided a mere 17 years earlier, Bowers v. Hardwick, 478 U. S. 186 (1986), see 539 U. S., at 578 (it “was not correct when it was decided, and it is not correct today”). Moreover, Justice Stevens would apply that constraint unevenly: He apparently approves those Warren Court cases that adopted jot-for-jot incorporation of procedural protections for criminal defendants, post, at 868, but would abandon those Warren Court rulings that undercut his *797 approach to substantive rights, on the basis that we have “cut back” on cases from that era before, post, at 869.
Justice Stevens also relies on the requirement of a “careful description of the asserted fundamental liberty interest” to limit judicial discretion. Post, at 882 (internal quotation marks omitted). I certainly agree with that requirement, see Reno v. Flores, 507 U. S. 292, 302 (1993), though some cases Justice Stevens approves have not applied it seriously, see, e. g., Lawrence, supra, at 562 (“The instant case involves liberty of the person both in its spatial and in its more transcendent dimensions”). But if the “careful description” requirement is used in the manner we have hitherto employed, then the enterprise of determining the Due Process Clause’s “conceptual core,” post, at 879, is a waste of time. In the cases he cites we sought a careful, specific description of the right at issue in order to determine whether that right, thus narrowly defined, was fundamental. See, e. g., Glucksberg, 521 U. S., at 722-728; Reno, supra, at 302-306; Collins v. Harker Heights, 503 U. S. 115, 125-129 (1992); Cruzan v. Director, Mo. Dept. of Health, 497 U. S. 261, 269-279 (1990); see also Vacco v. Quill, 521 U. S. 793, 801-808 (1997). The threshold step of defining the asserted right with precision is entirely unnecessary, however, if (as Justice Stevens maintains) the “conceptual core” of the “liberty clause,” post, at 879, includes a number of capacious, hazily defined categories. There is no need to define the right with much precision in order to conclude that it pertains to the plaintiff’s “ability independently to define [his] identity,” his “right to make certain unusually important decisions that will affect his own, or his family’s, destiny,” or some aspect of his “[s]elf-determination, bodily integrity, freedom of conscience, intimate relationships, political equality, dignity [or] respect.” Post, at 879, 880 (internal quotation marks omitted). Justice Stevens must therefore have in mind some other use for the careful- *798 description requirement — perhaps just as a means of ensuring that courts “procee[d] slowly and incrementally,” post, at 881. But that could be achieved just as well by having them draft their opinions in longhand.[4]
II
If Justice Stevens’ account of the constraints of his approach did not demonstrate that they do not exist, his application of that approach to the case before us leaves no doubt. He offers several reasons for concluding that the Second Amendment right to keep and bear arms is not fundamental enough to be applied against the States.[5] None is persuasive, but more pertinent to my purpose, each is either intrinsically indeterminate, would preclude incorporation of rights we have already held incorporated, or both. His approach *799 therefore does nothing to stop a judge from arriving at any conclusion he sets out to reach.
Justice Stevens begins with the odd assertion that “firearms have a fundamentally ambivalent relationship to liberty,” since sometimes they are used to cause (or sometimes accidentally produce) injury to others. Post, at 891. The source of the rule that only nonambivalent liberties deserve due process protection is never explained — proof that judges applying Justice Stevens’ approach can add new elements to the test as they see fit. The criterion, moreover, is inherently manipulable. Surely Justice Stevens does not mean that the Clause covers only rights that have zero harmful effect on anyone. Otherwise even the First Amendment is out. Maybe what he means is that the right to keep and bear arms imposes too great a risk to others’ physical well-being. But as the plurality explains, ante, at 782-783, other rights we have already held incorporated pose similarly substantial risks to public safety. In all events, Justice Stevens supplies neither a standard for how severe the impairment on others’ liberty must be for a right to be disqualified, nor (of course) any method of measuring the severity.
Justice Stevens next suggests that the Second Amendment right is not fundamental because it is “different in kind” from other rights we have recognized. Post, at 893. In one respect, of course, the right to keep and bear arms is different from some other rights we have held the Clause protects and he would recognize: It is deeply grounded in our Nation’s history and tradition. But Justice Stevens has a different distinction in mind: Even though he does “not doubt for a moment that many Americans ... see [firearms] as critical to their way of life as well as to their security,” he pronounces that owning a handgun is not “critical to leading a life of autonomy, dignity, or political equality.”[6] Ibid. *800 Who says? Deciding what is essential to an enlightened, liberty-filled life is an inherently political, moral judgment— the antithesis of an objective approach that reaches conclusions by applying neutral rules to verifiable evidence.[7]
No determination of what rights the Constitution of the United States covers would be complete, of course, without a survey of what other countries do. Post, at 895-896. When it comes to guns, Justice Stevens explains, our Nation is already an outlier among “advanced democracies”; not even our “oldest allies” protect as robust a right as we do, and we should not widen the gap. Ibid. Never mind that he explains neither which countries qualify as “advanced democracies” nor why others are irrelevant. For there is an even clearer indication that this criterion lets judges pick which rights States must respect and those they can ignore: As the plurality shows, ante, at 781-782, and nn. 28-29, this follow-the-foreign-crowd requirement would foreclose rights *801 that we have held (and Justice Stevens accepts) are incorporated, but that other “advanced” nations do not recognize — from the exclusionary rule to the Establishment Clause. A judge applying Justice Stevens’ approach must either throw all of those rights overboard or, as cases Justice Stevens approves have done in considering unenumerated rights, simply ignore foreign law when it undermines the desired conclusion, see, e. g., Casey, 505 U. S. 833 (making no mention of foreign law).
Justice Stevens also argues that since the right to keep and bear arms was codified for the purpose of “preventing] elimination of the militia,” it should be viewed as “ ‘a federalism provision’ ” logically incapable of incorporation. Post, at 897 (quoting Elk Grove Unified School Dist. v. Newdow, 542 U. S. 1, 45 (2004) (Thomas, J., concurring in judgment); some internal quotation marks omitted). This criterion, too, evidently applies only when judges want it to. The opinion Justice Stevens quotes for the “federalism provision” principle, Justice Thomas’s concurrence in Newdow, argued that incorporation of the Establishment Clause “makes little sense” because that Clause was originally understood as a limit, on congressional interference with state establishments of religion. Id., at 49-51. Justice Stevens, of course, has no problem with applying the Establishment Clause to the States. See, e. g., id., at 8, n. 4 (opinion for the Court by Stevens, J.) (acknowledging that the Establishment Clause “appl[ies] to the States by incorporation into the Fourteenth Amendment”). While he insists that Clause is not a “federalism provision,” post, at 897, n. 40, he does not explain why it is not, but the right to keep and bear arms is (even though only the latter refers to a “right of the people”). The “federalism” argument prevents the incorporation of only certain rights.
Justice Stevens next argues that even if the right to keep and bear arms is “deeply rooted in some important senses,” the roots of States’ efforts to regulate guns run just as deep. Post, at 899 (internal quotation marks omitted). *802 But this too is true of other rights we have held incorporated. No fundamental right — not even the First Amendment — is absolute. The traditional restrictions go to show the scope of the right, not its lack of fundamental character. At least that is what they show (Justice Stevens would agree) for other rights. Once again, principles are applied selectively.
Justice Stevens’ final reason for rejecting incorporation of the Second Amendment reveals, more clearly than any of the others, the game that is afoot. Assuming that there is a “plausible constitutional basis” for holding that the right to keep and bear arms is incorporated, he asserts that we ought not to do so for prudential reasons. Post, at 902. Even if we had the authority to withhold rights that are within the Constitution’s command (and we assuredly do not), two of the reasons Justice Stevens gives for abstention show just how much power he would hand to judges. The States’ “right to experiment” with solutions to the problem of gun violence, he says, is at its apex here because “the best solution is far from clear.” Post, at 902-903 (internal quotation marks omitted). That is true of most serious social problems — whether, for example, “the best solution” for rampant crime is to admit confessions unless they are affirmatively shown to have been coerced, but see Miranda v. Arizona, 384 U. S. 436, 444-445 (1966), or to permit jurors to impose the death penalty without a requirement that they be free to consider “any relevant mitigating factor,” see Eddings v. Oklahoma, 455 U. S. 104, 112 (1982), which in turn leads to the conclusion that defense counsel has provided inadequate defense if he has not conducted a “reasonable investigation” into potentially mitigating factors, see, e. g., Wiggins v. Smith, 539 U. S. 510, 534 (2003), inquiry into which question tends to destroy any prospect of prompt justice, see, e. g., Wong v. Belmontes, 558 U. S. 15 (2009) (per curiam) (reversing grant of habeas relief for sentencing on a crime committed in 1981). The obviousness of the optimal answer is *803 in the eye of the beholder. The implication of Justice Stevens’ call for abstention is that if We The Court conclude that They The People’s answers to a problem are silly, we are free to “interven[e],” post, at 902, but if we too are uncertain of the right answer, or merely think the States may be on to something, we can loosen the leash.
A second reason Justice Stevens says we should abstain is that the States have shown they are “capable” of protecting the right at issue, and if anything have protected it too much. Post, at 904. That reflects an assumption that judges can distinguish between a proper democratic decision to leave things alone (which we should honor), and a case of democratic market failure (which we should step in to correct). I would not — and no judge should — presume to have that sort of omniscience, which seems to me far more “arrogant,” post, at 896, than confining courts’ focus to our own national heritage.
Ill
Justice Stevens’ response to this concurrence, post, at 906-911, makes the usual rejoinder of “living Constitution” advocates to the criticism that it empowers judges to eliminate or expand what the people have prescribed: The traditional, historically focused method, he says, reposes discretion in judges as well.[8] Historical analysis can be difficult; it sometimes requires resolving threshold questions, and making nu *804 anced judgments about which evidence to consult and how to interpret it.
I will stipulate to that.[9] But the question to be decided is not whether the historically focused method is a perfect means of restraining aristocratic judicial Constitution-writing; but whether it is the best means available in an imperfect world. Or indeed, even more narrowly than that: whether it is demonstrably much better than what Justice Stevens proposes. I think it beyond all serious dispute that it is much less subjective, and intrudes much less upon the democratic process. It is less subjective because it depends upon a body of evidence susceptible of reasoned analysis rather than a variety of vague ethico-political First Principles whose combined conclusion can be found to point in any direction the judges favor. In the most controversial matters brought before this Court — for example, the constitutionality of prohibiting abortion, assisted suicide, or homosexual sodomy, or the constitutionality of the death penalty — any historical methodology, under any plausible standard of proof, would lead to the same conclusion.[10] Moreover, the methodological differences that divide historians, and the varying interpretive assumptions they bring to their work, post, at 907-908, are nothing compared to the differences among the American people (though perhaps not among graduates of prestigious law schools) with regard to the moral judgments Justice Stevens would have courts pronounce. And whether or not special expertise is needed *805 to answer historical questions, judges most certainly have no “comparative ... advantage,” post, at 880 (internal quotation marks omitted), in resolving moral disputes. What is more, his approach would not eliminate, but multiply, the hard questions courts must confront, since he would not replace history with moral philosophy, but would have courts consider both.
And the Court’s approach intrudes less upon the democratic process because the rights it acknowledges are those established by a constitutional history formed by democratic decisions; and the rights it fails to acknowledge are left to be democratically adopted or rejected by the people, with the assurance that their decision is not subject to judicial revision. Justice Stevens’ approach, on the other hand, deprives the people of that power, since whatever the Constitution and laws may say, the list of protected rights will be whatever courts wish it to be. After all, he notes, the people have been wrong before, post, at 910, and courts may conclude they are wrong in the future. Justice Stevens abhors a system in which “majorities or powerful interest groups always get their way,” post, at 911, but replaces it with a system in which unelected and life-tenured judges always get their way. That such usurpation is effected unabashedly, see post, at 908 — with “the judge’s cards . . . laid on the table,” ibid. — makes it even worse. In a vibrant democracy, usurpation should have to be accomplished in the dark. It is Justice Stevens’ approach, not the Court’s, that puts democracy in peril.

 I do not entirely understand Justice Stevens’ renaming of the Due Process Clause. What we call it, of course, does not change what the Clause says, but shorthand should not obscure what it says. Accepting for argument’s sake the shift in emphasis — from avoiding certain deprivations without that “process” which is “due,” to avoiding the deprivations themselves — the Clause applies not just to deprivations of “liberty,” but also to deprivations of “life” and even “property.”

 Justice Stevens insists that he would not make courts the sole interpreters of the “liberty clause”; he graciously invites “[a]ll Americans” to ponder what the Clause means to them today. Post, at 877, n. 22. The problem is that in his approach the people’s ponderings do not matter, since whatever the people decide, courts have the last word.

 Justice Breyer is not worried by that prospect. His interpretive approach applied to incorporation of the Second Amendment includes consideration of such factors as “the extent to which incorporation will further other, perhaps more basic, constitutional aims; and the extent to which incorporation will advance or hinder the Constitution’s structural aims”; whether recognizing a particular right will “further the Constitution’s effort to ensure that the government treats each individual with equal respect” or will “help maintain the democratic form of government”; whether it is “inconsistent . . . with the Constitution’s efforts to create governmental institutions well suited to the carrying out of its constitutional promises”; whether it fits with “the Framers’ basic reason for believing the Court ought to have the power of judicial review”; courts’ comparative advantage in answering empirical questions that may be involved in applying the right; and whether there is a “strong offsetting justification” for removing a decision from the democratic process. Post, at 918, 922-927 (dissenting opinion).

 After defending the careful-description criterion, Justice Stevens quickly retreats and cautions courts not to apply it too stringently. Post, at 882. Describing a right too specifically risks robbing it of its “universal valence and a moral force it might otherwise have,” ibid., and “loads the dice against its recognition,” post, at 882, n. 25 (internal quotation marks omitted). That must be avoided, since it endangers rights Justice Stevens does like. See ibid, (discussing Lawrence v. Texas, 539 U. S. 558 (2003)). To make sure those rights get in, we must leave leeway in our description, so that a right that has not itself been recognized as fundamental can ride the coattails of one that has been.

 Justice Stevens claims that I mischaracterize his argument by referring to the Second Amendment right to keep and bear arms, instead of “the interest in keeping a firearm of one’s choosing in the home,” the right he says petitioners assert. Post, at 894, n. 36. But it is precisely the “Second Amendment right to keep and bear arms” that petitioners argue is incorporated by the Due Process Clause. See, e.g., Pet. for Cert. i. Under Justice Stevens’ own approach, that should end the matter. See post, at 882 (“[W]e must pay close attention to the precise liberty interest the litigants have asked us to vindicate”). In any event, the demise of watered-down incorporation, see ante, at 765-766, means that we no longer subdivide Bill of Rights guarantees into their theoretical components, only some of which apply to the States. The First Amendment freedom of speech is incorporated — not the freedom to speak on Fridays, or to speak about philosophy.

Justice Stevens goes a step further still, suggesting that the right to keep and bear arms is not protected by the “liberty clause” because it *800 is not really a liberty at all, but a “property right.” Post, at 894. Never mind that the right to bear arms sounds mighty like a liberty; and never mind that the “liberty clause” is really a Due Process Clause which explicitly protects “property,” see United States v. Carlton, 512 U. S. 26, 41-42 (1994) (Scalia, J., concurring in judgment). Justice Stevens’ theory cannot explain why the Takings Clause, which unquestionably protects property, has been incorporated, see Chicago, B. & Q. R. Co. v. Chicago, 166 U. S. 226, 241 (1897), in a decision he appears to accept, post, at 871, n. 14.

 As Justice Stevens notes, see post, at 906-907,1 accept as a matter of stare decisis the requirement that to be fundamental for purposes of the Due Process Clause, a right must be “implicit in the concept of ordered liberty,” Lawrence, supra, at 593, n. 3 (Scalia, J., dissenting) (internal quotation marks omitted). But that inquiry provides infinitely less scope for judicial invention when conducted under the Court’s approach, since the field of candidates is immensely narrowed by the prior requirement that a right be rooted in this country’s traditions. Justice Stevens, on the other hand, is free to scan the universe for rights that he thinks “implicit in the concept,” etc. The point Justice Stevens makes here is merely one example of his demand that a historical approach to the Constitution prove itself, not merely much better than his in restraining judicial invention, but utterly perfect in doing so. See Part III, infra.

 Justice Stevens also asserts that his approach is “more faithful to this Nation’s constitutional history” and to “the values and commitments of the American people, as they stand today,” post, at 909. But what he asserts to be the proof of this is that his approach aligns (no surprise) with those eases he approves (and dubs “canonical,” ibid.). Cases he disfavors are discarded as “hardly bind[ing]” “excesses,” post, at 869, or less “enduring,” post, at 873, n. 16. Not proven. Moreover, whatever relevance Justice Stevens ascribes to current “values and commitments of the American people” (and that is unclear, see post, at 903-904, n. 47), it is hard to see how it shows fidelity to them that he disapproves a different subset of old cases than the Court does.

 That is not to say that every historical question on which there is room for debate is indeterminate, or that every question on which historians disagree is equally balanced. Cf. post, at 907-908. For example, the historical analysis of the principal dissent in Heller is as valid as the Court’s only in a two-dimensional world that conflates length and depth.

 By the way, Justice Stevens greatly magnifies the difficulty of a historical approach by suggesting that it was my burden in Lawrence to show the “ancient roots of proscriptions against sodomy,” post, at 908 (internal quotation marks omitted). Au contraire, it was his burden (in the opinion he joined) to show the ancient roots of the right of sodomy.