Filed 4/17/23  Sail Exit Partners v. Schindler CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SAIL EXIT PARTNERS, LLC, | |
| Plaintiff and Respondent, | G060431 |
| v. | (Super. Ct. No. 30-2018-00994978) |
| WALTER L. SCHINDLER, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Robert J. Moss, Judge.  Affirmed.

Estes Law Group and Polly J. Estes for Defendant and Appellant.

Troutman Pepper Hamilton Sanders, Peter N. Villar and Elizabeth Holt Andrews for Plaintiff and Respondent.

\*        \*        \*

Walter Schindler appeals from the trial court's entry of judgment after a one-day bench trial in which the court found in favor of Sail Exit Partners, LLC (SEP) on its conversion causes of action. In an argument raised for the first time on appeal, Schindler contends SEP lacked standing to sue him because he never effectively resigned as one of SEP's two managers. According to Schindler, SEP's standing therefore falters because he (Schindler) did not authorize filing or continuing the suit against him.

Schindler also challenges the sufficiency of the evidence to support the damage award amount, which the trial court based on the value of stock at the time Schindler converted it. (Civ. Code, § 3336.) According to Schindler, the damages, if any, should have been calculated based on the stock's declining value at some unspecified point before he returned it (after it had lost 90 percent of its value), and *only if* SEP proved it intended to sell the stock during the period he controlled it; Schindler asserts no evidence suggests SEP tried to do so.

Preliminarily, we deny SEP's motion to dismiss the appeal for failure to provide an adequate record, including basic components such as SEP's complaint, and for corresponding briefing deficiencies including failure to provide citations to the record. As we explain, we find no merit in Schindler's appellate claims and therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

As the law requires, we set out the facts in the light most favorable to the trier of fact's decision, "resolving all conflicts and indulging all reasonable inferences to support the judgment." (*Green Wood Industrial Co. v. Forceman Internat. Development Group, Inc*. (2007) 156 Cal.App.4th 766, 770, fn. 2.)

Formed in June 2014, SEP held a portfolio of interests in several renewable energy technology companies. A related investment company, Sail Venture Partners II

2

(SVP II), served as SEP's managing member, and SVP II's managing members, Schindler and Hank Habicht, therefore also managed SEP.

Testimony at trial indicated Schindler "was forced to resign" as a manager in April 2015 "because he had mismanaged SEP" and allegedly "was caught misappropriating funds" totaling about $261,000. According to Schindler, who represented himself at trial, the "mismanagement" was simply a difference of opinion with an influential member with whom he "butted heads a lot." Schindler denied misappropriating any funds; he asserted the disputed amounts were his ordinary compensation and not, as SEP's complaint alleged, a diversion of SEP portfolio distributions.

The testimony also showed that in July 2017, Habicht "and the majority of the members of SEP believed it was in SEP's best interest to wind up [its] affairs and liquidate [its] assets at that time." They therefore arranged the appointment of a "liquidating trustee" to wind up SEP's operations—a third-party entity known as Carlton Klein, LLC, which was run by its president, Carlton Klein.

Soon after his appointment, Klein learned that Schindler was interfering in his efforts to manage SEP's dissolution. He received calls from SEP portfolio companies alerting him that Schindler "was continuing to represent to them that he controlled the portfolio investments, that he controlled SEP, and that he had threatened to sue them if they would transact any business with SEP through . . . the trustee." Klein heard that in "several" instances Schindler instructed portfolio companies to change their bank-wiring instructions to divert funds from SEP. Schindler also formed an entity by the name of "Sail Capital, LLC" in May 2016, more than a year after he resigned from SEP, and then amended the name so that it was the same as SEP's, albeit registered in a different state: "Sail Exit Partners, LLC." Worried that this would "mislead investors and others that he [i.e., Schindler] was still the manager of [SEP]," Klein continued his investigation.

3

Klein testified that in April 2017 Schindler contacted the brokerage firm, Roth Capital in Newport Beach, that held SEP's stock shares in three companies:  Ener-Core, Inc. (Ener-Core), Enerpulse Technologies, Inc. (Enerpulse), and Mynd Analytics, Inc. (Mynd).  Klein testified all three companies were "publicly traded"; he expressly stated that Ener-Core shares traded on the NASDAQ stock exchange.

Schindler persuaded Roth Capital to transfer SEP's physical stock certificates to him in April and May of 2017, including 586,005 shares of Ener-Core stock on April 28, 2017.  At the time of the transfer, the Ener-Core stock was worth about $950,000 based on the shares' NASDAQ closing price ($1.62 per share) that day.

Klein testified Schindler later conceded as to the Ener-Core shares that he "transformed SEP's stock certificate[s] to unrestricted digital shares" and transferred them to a foreign brokerage firm, Schneider Brothers, "to be held at Kaiser Partner Privatbank in Liechtenstein."  Schindler, on behalf of his Sail Capital company, entered into an agreement with Schneider Brothers to sell the shares on the European market on July 19, 2017.  The agreement identified the value of the shares on the agreement date as $879,007.50.

Unbeknownst to SEP, Schneider Brothers eventually sold about one-third of the Ener-Core shares (187,549 shares), netting $110,988.23, which neither Schneider Brothers nor Schindler ever forwarded to SEP.

Schindler returned the remaining 398,456 Ener-Core shares to SEP in September 2018, but by then the stock had lost 90 percent of its value, plummeting to $0.08 per share by the time of trial.

SEP filed a complaint in May 2018 against five defendants alleging eight causes of action, including three against Schindler for conversion.  The first was for "misappropriating and wrongfully taking possession of $261,000 from SEP's bank account."  The second for "misappropriat[ing] and wrongfully interfer[ing] with SEP's rights of ownership and possession by taking possession of 586,005 shares of

4

Ener-Core," for which SEP sought $950,000 in damages. And the third for similarly converting SEP's 80 shares of Mynd Analytics stock and 275,350 shares of Enerpulse stock, which were never returned and for which SEP claimed approximately $5,000 in damages.

At trial, SEP refined its damages calculation for conversion of the Ener-Core stock to $917,451.62 to account for the diminished value of the returned shares. Including losses related to the other causes of action, SEP's damages claim totaled approximately $1.2 million. The trial court found in favor of SEP on all three causes of action and, including prejudgment interest, entered a damages award of just over $1.5 million ($1,550,879.88).

### DISCUSSION

1. *Standing; Motions to Augment*

Schindler contends we must reverse the judgment because SEP lacked standing to sue him. He acknowledges he did not raise this argument below, but relies on authority that "standing can be raised at any time in the litigation, even for the first time on appeal." (*Applera Corp. v. MP Biomedicals, LLC* (2009) 173 Cal.App.4th 769, 785.) This general principle does not aid Schindler for several reasons, but first we briefly set out the premise for his claim.

On the day SEP's respondent's brief was due on appeal, Schindler filed a motion to augment the record with documents said to support his contention SEP lacked standing to sue him.[1] Chief among the documents was Schindler's April 2015 letter in which he resigned as one of SEP's managing members. Schindler contends SEP lacked standing to sue him because his resignation was ineffective. He argues his resignation letter included a condition precedent and, because that condition (a release of SEP's

_____

[1] As discussed below, we deny Schindler's motion.

5

claims against him) was not satisfied, he never actually resigned from SEP, contrary to Klein's testimony at trial.[2]

Schindler did not introduce his resignation letter at trial, nor did he deny he resigned or suggest his resignation was ineffective. Instead, he claimed below that he "was trying to facilitate the sale of shares" that "were unmarketable in the United States"—impliedly doing so in SEP's best interests and expressly claiming it was not for his own financial interest.

On appeal, Schindler relies on the general proposition that a corporate entity acts only through its agents and, while he concedes Klein authorized SEP's initiation of the lawsuit against him, he asserts that he—Schindler—held veto power over that decision: "In sum, SEP had no right to file this lawsuit because (1) the condition precedent to Schindler's resignation from the management of SEP was never satisfied

---

[2] In support of his augmentation motion, Schindler states that his resignation, as communicated by this letter, included "the following crucial provision: 'This letter of resignation is effective upon and subject to the signing by all parties of a mutually satisfactory settlement agreement and full release, including a release of all liability and claims against me [Walter Schindler] by SAIL Exit Partners LLC and all affiliates, including Christopher P. Ryan.'" (Brackets included in Schindler's brief.) Ryan was the investor with whom Schindler "butted heads," as mentioned above.

In addition to opposing Schindler's augmentation motion, SEP filed its own motion to augment the record in response and as part of its motion to dismiss Schindler's appeal. We grant SEP's motion as it is properly made to complete the record of the trial proceedings and does not include any of the defects of Schindler's motion. (Cal. Rules of Court, rule 8.155.) The exhibits to the motion include a "Tolling Agreement" between SEP and Schindler that was admitted at trial. As Klein testified, the first recital includes Schindler's acknowledgment of Klein's "sole authority to manage Sail Exit Partners' assets without any interference from him." And in the fourth paragraph, Schindler "agree[d] to refrain from any interference with [Klein's] management of Sail Exit Partners and that he would not challenge [Klein's] sole authority to manage the business affairs of Sail Exit Partners." Schindler in his reply brief attempts to deflect these concessions with extrinsic evidence regarding his beliefs about the scope of the agreement.

and (2) Schindler did not agree to the filing of this suit." In other words, Schindler now claims he was still a managing member of SEP through the pendency of the lawsuit, and he therefore had authority to countermand its filing. Schindler asserts that absent his consent, SEP had no standing to initiate the case, nor to continue to pursue it on appeal. We are not persuaded.

In his reply brief Schindler for the first time analogizes Klein's position in authorizing SEP's lawsuit against him to that of Michael Newdow, who challenged a school district policy requiring the "'Pledge of Allegiance to the Flag of the United States of America'" to fulfill mandated "'appropriate patriotic exercises'" in elementary school under a California statute. (*Elk Grove Unified School Dist. v. Newdow* (2004) 542 U.S. 1, 7 (*Newdow*); see Educ. Code, § 52720.) Newdow contended that including the words "'under God'" in the Pledge amounted to religious indoctrination in violation of the Establishment and Free Exercise Clauses. (*Newdow,* at pp. 5, 8; see U.S. Const., 1st Amend.) The analogy is not only inapt, it actually demonstrates why Schindler's standing challenge has no merit.

According to Schindler, the high court in *Newdow* "ruled that a father bringing suit *on behalf of his daughter* lacked standing because he did not have legal custody of his daughter." (Italics added.)

Schindler sees the same flaw here. Specifically, he argues Klein acted on behalf of SEP just as Schindler suggests Newdow attempted to act on behalf of his minor daughter. Schindler thus reasons that because the high court concluded Newdow did not have standing under the facts of that case, SEP (Schindler says nothing of Klein's standing) does not have standing here. Careful attention to the parallel Schindler attempts to draw between Klein and Newdow reveals that his syllogism should be: if Newdow lacked standing, so does Klein. But unlike Newdow, Klein is not a party in this case, so the analogy fails.

As the Supreme Court explained, "the *party* bringing the suit must establish standing to prosecute the action. 'In essence the question of standing is whether the *litigant* is entitled to have the court decide the merits of the dispute or of particular issues.'" (*Newdow*, *supra*, 542 U.S. at p. 11, italics added.) "At its core, standing concerns a specific *party*'s interest in the outcome of a lawsuit." (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1247, italics added.) Standing is a component of justiciability, a doctrine related to separation of powers under which unelected courts will not decide matters unnecessarily. (*People ex rel. Becerra v. Superior Court* (2018) 29 Cal.App.5th 486, 495; see *Newdow*, *supra*, 542 U.S. at p. 11.)

Consequently, "'standing to invoke the judicial process requires an actual justiciable *controversy* as to which the complainant has a real interest in the ultimate adjudication because he or she has either suffered or is about to suffer an injury of sufficient magnitude reasonably to assure that all of the relevant facts and issues will be adequately presented to the adjudicator.'" (*Teal v. Superior Court* (2014) 60 Cal.4th 595, 599.) Standing arises when the plaintiff "'has "'an actual and substantial interest in the subject matter of the action,' and stands to be 'benefited or injured' by a judgment in the action."'" (*Turner v. Seterus, Inc.* (2018) 27 Cal.App.5th 516, 525.)

Standing thus "derives from the principle that '[e]very action must be prosecuted in the name of the real party in interest.'" (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 59; Code Civ. Proc., § 367.) "[T]he real party in interest is the party who has title to the cause of action, i.e., the one who has the right to maintain the cause of action." (*Vaughn v. Dame Construction Co.* (1990) 223 Cal.App.3d 144, 147.) A real party in interest "is the owner of the cause of action." (*Id.* at p. 148.)

These fundamental precepts lead to the inescapable conclusion that SEP has standing here. SEP is the owner of the assets that Schindler allegedly converted. That actual and substantial interest in the subject matter of the action is the essence of standing. No more is required.

8

Schindler mistakenly conflates control of an entity by individuals who themselves need not have standing with the necessity that the entity—as the party in the case—must have standing. While the latter issue, a party's standing, may be raised at any time under well-established precedent, there is no similar authority related to raising the right of control of an entity. That issue—the right of control—is a question of law and fact like any other trial issue; it is not a proper subject for new evidence on appeal.

*Newdow* again illustrates the difference. The issue the Supreme Court decided there was not Newdow's standing to sue *on behalf of* his daughter, as Schindler characterizes it. To the contrary, Newdow "no longer claimed" to be acting on *her* behalf once the child's mother intervened on appeal in the suit and explained that "a state-court order granted her 'exclusive legal custody' of the child, 'including the sole right to represent [the daughter's] legal interests and make all decision[s] about her education' and welfare." (*Newdow*, *supra*, 542 U.S. at p. 9.)

Instead, the high court addressed Newdow's claimed "right to seek redress for an alleged injury to *his own* parental interests," rather than his daughter's interest in a representative capacity. (*Newdow*, *supra*, 542 U.S. at p. 10, italics added.) The Supreme Court reversed the Ninth Circuit's conclusion that Newdow had standing to vindicate a personal right there, where his right as a noncustodial parent to engage his daughter regarding his religious beliefs, or lack thereof, was not restricted by the school district's policy. (*Id.* at pp. 16-17.) To the extent Newdow's interest in his parental relationship with his daughter could be said to be impacted by third party actions—like the district's Pledge policy—he did not have the right "to reach outside the private parent-child sphere to restrain the acts of a third party." (*Id.* at p. 17.) The mother's evidence showed as much since she had final authority for education decisions, and the family court's orders were considered on appeal precisely because they were relevant to the issue of a *party*'s standing in the case, i.e., Newdow's.

*Newdow* offers no support for Schindler's claim that evidence regarding who does or does not control a corporate entity is relevant to whether *the entity*, as the named party and real party in interest, has standing. This brings us to Schindler's augmentation motion, which we deferred by an earlier order for resolution in conjunction with our decision on appeal. We deny the motion for several reasons.

First, it is improper. The documents Schindler submits to augment the record to support his bid for reversal, such as his resignation letter, were not part of the record below. By rule, augmentation is the means to make "document[s] filed or lodged in the case in superior court" part of the appellate record (Cal. Rules of Court, rule 8.155(a)(1)(A)) when earlier "omitted by the parties, through mistake or neglect" in designating the record at the outset of an appeal. (*State Comp. Ins. Fund v. WallDesign Inc.* (2011) 199 Cal.App.4th 1525, 1528, fn. 1; see also *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295 [appellant bears burden to provide adequate record to assess his or her claim of trial court error].)

Second, Schindler does not request that we take new evidence on appeal under the established procedures for doing so. (Code Civ. Proc., § 909 [appellate court may "for the purpose of making . . . factual determinations . . . take additional evidence"]; Cal. Rules of Court, rule 8.252(c)(1) ["a party may move that the reviewing court take evidence"].) Nor would we do so had he brought his motion under those provisions.

"The power created by the statute [Code Civ. Proc., § 909] is discretionary and should be invoked sparingly, and only to affirm the case." (*Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 42.) "The power to take evidence in the Court of Appeal is never used where there is conflicting evidence in the record and substantial evidence supports the trial court's findings." (*Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian* (1990) 218 Cal.App.3d 1058, 1090.)

Here, to the extent the question of corporate control has any relevance in this litigation, the evidence presented and the doctrine of implied findings requires us to

10

conclude the trial court's judgment resolved the issue against Schindler. "The doctrine of implied findings requires the appellate court to infer the trial court made all factual findings necessary to support the judgment." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.)

Klein addressed the issue of control when he testified Schindler resigned; he also said Habicht and SEP's members had grounds to "force" Schindler's resignation and to appoint Klein to manage SEP through its dissolution. Klein recounted the terms of the tolling agreement he entered into on behalf of SEP with Schindler, which included Schindler's acknowledgment of Klein's sole control of SEP. That agreement was admitted into evidence.

Schindler did not dispute at trial that he resigned or suggest there were any impediments to Klein exercising sole control over SEP. The trial court's judgment in favor of SEP and against Schindler resolved the issue of corporate control against him. We are bound by that conclusion under the standard of review. On appeal we must make all inferences in favor of the judgment and resolve all conflicts in the evidence in favor of the judgment. (*Shneer v. Llaurado* (2015) 242 Cal.App.4th 1276, 1286-1287 (*Shneer*).)

The course of this appeal, in which Schindler's augmentation motion has spawned a motion by respondent to augment the record and provide documentary evidence to respond to Schindler's corporate control claims, illustrates why an appellate court's power to take additional evidence is limited, to be exercised only in exceptional circumstances. At some point, litigation must end; otherwise the appellate process becomes a hall of mirrors in which the same underlying issues are endlessly retried.

Schindler had the opportunity to present his evidence regarding corporate control at trial; he failed to do so. He has therefore forfeited his right to present such evidence on appeal. The forfeiture rule fosters efficiency and deters gamesmanship: "'''''"In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them. The law casts upon the

11

party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal.'"""'" (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264-265.) These observations are just as applicable to evidence not presented as they are to objections not made. Forfeiture precludes Schindler from presenting new evidence on appeal.[3]

The well-established law related to standing fails to furnish Schindler with a basis for a second bite at the apple to present new or additional evidence regarding managerial control of SEP. The evidence Schindler seeks to present for the first time on appeal on that issue does not undermine SEP's standing.

2.    *Damages*

Schindler challenges the sufficiency of the evidence to support the trial court's damages award based on the value of the converted stock. "When conducting a substantial evidence review, we must review the entire record in the light most favorable to the prevailing party, resolve all conflicts in the evidence in favor of the ruling or judgment being reviewed, and indulge all reasonable inferences in support of the [trial] court's findings." (*Shneer*, *supra*, 242 Cal.App.4th at pp. 1286-1287.)

---

[3]    Forfeiture similarly disposes of Schindler's belated ethical claims against SEP's attorneys. He now claims prosecution of the action against him was fatally flawed, and reversal of the judgment is required, because SEP's lawyers had, and have, an obligation to withdraw from representing SEP based on the dispute over who controls the company, and they must also disgorge any fees received. Schindler did not raise this contention below and has not filed a motion to disqualify the lawyers, which requires that the movant demonstrate standing to do so. (*In re Marriage of Murchison* (2016) 245 Cal.App.4th 847, 851; *Great Lakes Construction, Inc. v. Burman* (2010) 186 Cal.App.4th 1347, 1356.) In light of these deficiencies, we treat Schindler's stray appellate demands for reversal, withdrawal, offset, and disgorgement as waived.

12

Schindler contends the value the trial court placed on the stock—its price per share on the date of conversion—was speculative because SEP failed to present evidence "that there was a market for the stock." According to Schindler, that is why he tried to sell the shares on the European market. The trial court as sole judge of witness credibility was not required to credit Schindler's explanation for his actions. (*Antelope Valley Groundwater Cases* (2020) 59 Cal.App.5th 241, 260.) The court reasonably could conclude Schindler lacked authority to move the shares out of SEP's account into his own possession and control.

As to the value of the stock, Schindler's contention is without merit because when, as here, a company's stock is "publicly traded on an exchange, the 'market value' of its shares [is] easy to determine"—namely its price per share on the exchange. (*Steiner Corp. v. Benninghoff* (D.Nev. 1998) 5 F.Supp.2d 1117, 1126.) Schindler himself in his brokerage agreement with Schneider Brothers assigned a value to the shares that still closely approximated the damages figure despite what he claimed was a declining market, i.e., about $880,000 for the Ener-Core stock alone vs. $950,000 on its conversion date three months earlier. Ample evidence therefore supports the damage award amount.

Schindler also attacks the damages award as speculative since SEP "failed to present any evidence that it would have sold [the] stock." Schindler argues that absent evidence SEP "would have sold the shares of stock [he] transferred to Schneider Brothers during the time Schneider Brothers held onto it, SEP's evidence of damages for the unsold shares is entirely speculative." We disagree. Schindler's contention founders because evidence at trial supported the court's finding that Klein was appointed as SEP's trustee precisely to liquidate its assets. Even before Klein took control, the members' intention to dispose of SEP's portfolio holdings was evident in the company's very name: Sail *Exit* Partners.

13

It would be nonsensical to require the victim of conversion to attempt to sell shares it no longer controls because a tortfeasor has converted them. By statute, the victim's damages are "presumed to be . . . [t]he value of the property at the time of the conversion." (Civ. Code, § 3336.) The tortfeasor thus bears the risk of loss in value of a converted asset during the time he or she has taken it. Schindler's damages challenges are without merit.

**DISPOSITION**

The judgment is affirmed. SEP is entitled to its costs on appeal.


GOETHALS, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.

14